**DESCOMP, INC., Plaintiff,**

**v.**

**Arthur SAMPSON, Administrator of the General Services Administration, Defendant.**

**Civ. A. No. 4773.**

United States District Court, D. Delaware.

June 3, 1974.

Jacob Kreshtool and John S. Grady of Bader, Dorsey & Kreshtool, Wilmington, Del., for plaintiff.

John H. McDonald, Asst. U. S. Atty., Wilmington, Del., and Harold C. Nystrom, Atty., Dept. of Labor, Washington, D.C., of counsel, for defendant.

## OPINION

LATCHUM, Chief Judge.

Descomp, Inc. ("Descomp") is a Delaware corporation with its principal place of business located at Bear, Delaware. Descomp is engaged in the business of gathering information from documents and transcribing it in the form of symbols onto punch cards or magnetic tape, an operation commonly known as keypunching. It has engaged in this business since 1969.

On March 14, 1973, the General Services Administration ("GSA") offered for bid a contract for the transcription of certain data onto punch cards and tape, solicitation number 3FP–A5–N–3473–12–73.

One of the conditions of the soliciation was that bidding parties had to agree to pay their keypunch employees at the prevailing wage rate for keypunch operators in the Washington, D. C. area. This condition was based upon the belief of GSA and the Department of Labor that the provisions of the Service Contract Act of 1965 ("the Act"), 41 U.S.C. §§ 351–358, were applicable. Descomp submitted a bid which included wage rates for its keypunch operators based upon rates prevailing in the Washington, D.C. area. Descomp also filed a protest over the wage provision with the Department of Labor which was disallowed on May 1, 1973. Descomp filed an appeal with the General Accounting Office ("GAO") pursuant to 4 CFR Part 20 and this protest was also disallowed on November 28, 1973.

Descomp then filed a complaint in this court on December 3, 1973, seeking a declaration that the wage determinations to be applied under the Act should have been those of the Wilmington, Delaware area rather than the Washington, D.C. area, and also seeking preliminary injunctive relief to prevent the contract

from being awarded on February 4, 1974 as scheduled until the wage determination issue had been settled. Later Descomp amended its complaint to seek a declaration that the Act is inapplicable to a contract for keypunch services and also asked for damages of $3,600 in bid preparation costs, $3,000 for the expenses involved in prosecuting its protests, and $3,000 in attorney fees. Descomp alleged jurisdiction under 5 U.S.C. § 702 and 28 U.S.C. § 1346(a)(2).

After a hearing, the Court on January 18, 1974 denied Descomp's motion for a preliminary injunction, holding that although Descomp had demonstrated a likelihood of success on the merits, the requisite showing of irreparable harm had not been made. Thereafter, the Court set the matter down for trial to the Court on May 6, 1974. Most of the facts in the case are undisputed and were introduced into evidence by stipulation and affidavits. The May 6 hearing was confined for the most part to the question of damages.

The Act establishes standards for minimum compensation and safety and health protection of employees working for contractors and sub-contractors performing service contracts entered into with the Federal Government. Under its provisions, every bid specification subject to the Act must contain a stipulation requiring, *inter alia*, that specified minimum monetary wages and fringe benefits determined by the Secretary of Labor ("the Secretary") based on wage rates and fringe benefits prevailing in the locality be paid to service employees engaged by the contractor or sub-contractor. By its terms, the Act applies to contracts entered into by the United States, in excess of $2,500, the principal purpose of which is to furnish services in the United States through the use of service employees.

The procedure ordinarily used by GSA in preparing a solicitation for bids is as follows: The Procurement Division of GSA is notified by another GSA division of its requirements.[1] An initial determination is then made as to whether or not the Act is applicable to the prospective contract. If this determination is in the affirmative, GSA sends Standard Form 98, a Notice of Intention to Make a Service Contract and Response to Notice ("SF 98"), to the Department of Labor, Wage and Hour and Public Contract Divisions ("WHPC").[2] If WHPC agrees that the Act applies to the contract, it returns the SF 98 and attaches wage determinations for the services to be rendered under the contract.[3] This procedure is in accord with the guidelines set forth in 41 CFR § 1–12.905–3.

GSA did follow its general procedure in the instant case. It made an initial determination that a contract for keypunching would be covered by the Act. On the SF 98 sent to WHPC on March 6, 1973, GSA listed the services to be performed as "keypunching and verifying of 'IBM' Cards for the period July 1, 1973 through June 30, 1974," listed the service employees as "keypunchers" and "verifiers," and listed the place of performance as "D.C. Metropolitan area; Va., Portsmouth, Arl., Fairfax; Md., Montgomery, Prince Georges & Frederick Counties."[4] In its Response to Notice, WHPC attached a list of wage determinations for keypunch operators in the above listed areas. Thereafter GSA issued the invitation to bid which stipulated that the wages to be paid to keypunch operators were those prevailing in the greater Washington, D.C. area.

Descomp contends that the Act is not applicable for two reasons. First, because the contractor will be producing materials, namely punched cards, the service involved in this contract is merely incidental to the manufacture and furnishing of materials. Second, keypunch operators are not "service em-

---

1. Government's Trial Exhibit ("GX") 7, pp. 2–3.

2. Id. pp. 3–4.

3. Id. p. 14.

4. GX 3.

ployees" within the meaning of the Act in that the Act was intended to be limited to "blue-collar" employees while keypunch operators are in the nature of clerical or "white collar" employees. Descomp further argues that even if the Act were applicable to the contract in question, the wage determination for keypunch operators should have been based upon wages prevailing in the area of Wilmington, Delaware rather than Washington, D.C.

Before addressing the substantive issues, the Court must consider two procedural issues raised by the Government, first, that Descomp lacks standing to challenge the determination of wage rates, and second, that the Secretary has been vested with the responsibilities of determining the applicability of the Act to Government contracts and his determination is either not judicially reviewable or the scope of review is quite limited.

1. *Standing.*

It is the Government's position that:

"The history and language of the Service Contract Act indicate that Congress was exclusively concerned with protection of the wage rates of service employees and did not contemplate any right on the part of aggrieved bidders. Thus, Descomp, not being within the zone of interest protected by the statute, is not entitled to recover damages for failure to adhere to the provisions of the statute." [5]

■ The Court does not agree with this analysis. Two Supreme Court opinions, Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970) and Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970), establish a two-fold test for determining standing to challenge action of a governmental agency. First, the plaintiff must allege injury in fact, economic or otherwise, and second, the plaintiff must establish that he falls

within the zone of interest protected by the statute or regulation upon which he relies.

■ Descomp has clearly met the first criterion by its allegation that it has suffered monetary damages in bid preparation costs and in lost profits it allegedly would have received had it been able to submit a bid which reflected Wilmington, Delaware wage levels for keypunch operators. As for the second criterion, Judge Gibbons writing for the Third Circuit Court of Appeals in Merriam v. Kunzig, 476 F.2d 1233 (C.A. 3, 1973), cert. den. Gateway Center Corp. v. Merriam, 414 U.S. 911, 94 S.Ct. 233, 38 L.Ed.2d 149 (1973), stated that a bidder is within the zone of interest provided by the procurement statute, 41 U.S.C. § 253, which provides:

"Whenever advertising is required—

(a) The advertisement for bids shall be made a sufficient time previous to the purchase or contract, and specifications and invitations for bids shall permit such full and free competition as is consistent with the procurement of types of property and services necessary to meet the requirements of the agency concerned.

(b) All bids shall be publicly opened at the time and place stated in the advertisement. Award shall be made with reasonable promptness by written notice to that responsible bidder whose bid, conforming to the invitation for bids, will be most advantageous to the Government, price and other factors considered: *Provided,* That all bids may be rejected when the agency head determines that it is in the public interest so to do."

Judge Gibbons stated a reading of both subsections evinces a clear legislative policy to invite as wide and free a competition as possible, and because of this policy "the statute protects not only the Government's interest in securing advantageous contracts, but also the interests of those responding to the Government's invitation to do business with it."

---

5. Docket Item 23, pp. 10–11.

Id. at 1242. See also Scanwell Laboratories, Inc. v. Shaffer, 137 U.S.App.D.C. 371, 424 F.2d 859 (1970) and Keco Industries, Inc. v. United States, 428 F.2d 1233, 192 Ct.Cl. 773 (1970). In light of the above authorities the Court concludes that Descomp has standing to allege that it suffered injury when it was forced to submit a non-competitive bid by GSA's requirement that the wages to be paid to Descomp's employees must be those prevailing in the Washington, D.C. area for keypunch operators.

2. *Reviewability.*

The Government refers the Court to the recent decision of Curtiss-Wright Corp. v. McLucas, 364 F.Supp. 750 (D. N.J.1973) where the Court stated that the determination made by the Secretary whether or not a particular Government contract is subject to the Act is not judicially reviewable, relying on the Supreme Court's decision in Endicott Johnson Corp. v. Perkins, 317 U.S. 501, 63 S.Ct. 339, 87 L.Ed. 424 (1943). The Court declines to follow *McLucas.* This Court's own interpretation of *Endicott Johnson Corp.* is that the Supreme Court was concerned with the question of primary jurisdiction although concededly there is language in that opinion which could be taken as a view that the Secretary's determination is conclusive. Since the Secretary has already acted in the instant case, the issue of primary jurisdiction is not before the Court. Moreover, any statements by the Supreme Court regarding reviewability of administrative action prior to 1946 must be read in light of Congress' passage of the Administrative Procedure Act, 5 U. S.C. § 551 et seq. ("APA"). The APA by its terms provides for judicial review of administrative action except where a statute precludes judicial review or where agency action is committed to agency discretion by law. 5 U.S.C. § 701(a)(1), (2). 5 U.S.C. § 706 provides in pertinent part that

"the reviewing court shall—

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

\* \* \* \* \* \*

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right. . . ."

As will be shown, Descomp argues that the Secretary, in making the Washington, D.C. wage levels applicable to the contract in dispute, disregarded the clear intent of Congress as to certain terms of the Act as well as the Department's own regulations. Where such an argument is made, the agency cannot preclude judicial review by claiming that the matters in question have been committed to agency discretion. *Scanwell Laboratories, Inc.*, supra at 874. Thus, the Court may review the Secretary's decision at least to the extent of determining whether it is in violation of the Act or the Department's regulations promulgated pursuant to the Act.

3. *Scope of Review.*

The Government argues in the alternative that because the language of the Act is not precise, its construction is an exercise of discretion which is best left to the expertise of the administrative agency. Without so stating, the Government is apparently suggesting that the reviewing court apply the "rational basis" test, that is, the Secretary's determination action should be upheld if there is a rational basis for the decision. The other standard of review is the "substitution of judgment" approach where the reviewing court in effect "second guesses" the decision of the administrative agency. Traditionally the "rational basis" standard is applied when reviewing "questions of fact" and the "substitution of judgment" standard is applied when reviewing "questions of law." Often the distinction between the "facts" and the "law" is anything but clear and in that situation, such as in the instant case, the choice between the different standards of review is largely a matter of judicial

discretion. See 4 Davis, Administrative Law Treatise § 30.08. For reasons that follow the Court holds that the Secretary's determination of the applicability of the Act will be reviewed under the "rational basis" standard while his determination that the Washington, D.C. area wage levels should apply will be reviewed under the "substitution of judgment" standard.

The applicability of the Act depends upon answering two questions in the affirmative, first, whether transcribing data onto punch cards and magnetic tape is a "service" within the meaning of the Act, and second, whether keypunch operators are "service employees" within the meaning of the Act. The Court considers these issues to be "factual" because they must be determined each time a potential bid solicitation is referred to WHPC for a determination of the applicability of the Act. Repeated determinations of these questions has resulted in the development of an expertise on the part of the Secretary to which the Court must give some deference. "Where the question is one of specific application of a broad statutory term in a proceeding in which the agency administering the statute must determine it initially, the reviewing court's function is limited. . . . [T]he Board's determination that specified persons are 'employees' under this Act [Wagner] is to be accepted if it has 'warrant in the record' and a reasonable basis in law." NLRB v. Hearst Publications, Inc., 322 U.S. 111, 131, 64 S.Ct. 851, 860, 88 L.Ed. 1170 (1944).

The other issue, whether the word "locality" used in the Act refers to the situs of the Government agency or to the situs where the contractor will perform the work is a nonrecurring one which requires inquiry into the Congressional intent. Once Congress' intent at the time of passage of the Act is determined, the only remaining issue to be determined on an individual basis with regard to potential bid solicitations is the location of the agency or of the contractor. The Secretary is in no better position than the courts to determine Congressional intent in using the word "locality" in the Act. The Supreme Court in American Ship Building Co. v. NLRB, 380 U.S. 300, 85 S.Ct. 955, 13 L. Ed.2d 855 (1965) indicated that in determining a broad Congressional policy the court shall not defer to the judgment of the agency.

"We are unable to find that any fair construction of the provisions relied on by the Board in this case can support its finding of an unfair labor practice. Indeed, the role assumed by the Board in this area is fundamentally inconsistent with the structure of the Act and the function of the sections relied upon. The deference owed to an expert tribunal cannot be allowed to slip into a judicial inertia which results in the unauthorized assumption by an agency of major policy decisions properly made by Congress." Id. at 318. See also FTC v. Fred Meyer, Inc., 390 U.S. 341, 355–357, 88 S.Ct. 904, 19 L.Ed.2d 1222 (1968).

Therefore on this issue the Court will substitute its judgment for that of WHPC.

### 4. *The Merits of the Controversy.*

The Court now turns to review the disputed determinations made by the Secretary in the instant case. The first of these is his determination that the transformation of data from informational source documents into a code which is either punched onto cards or recorded onto magnetic tapes is a "service" within the meaning of the Act. By its terms, the Act applies to all Government contracts in excess of $2,500 the principal purpose of which is to furnish services in the United States. The regulations of the Department of Labor suggest that where "the principal purpose is to provide something other than services of the character contemplated by the Act and any such services which may be performed are only incidental to the performance of a contract for another purpose, the Act does not apply." 29

CFR § 4.111. Thus, the Court must analyze the Secretary's decision in light of the statute and his own regulations to determine whether there is a rational basis for his decision. Descomp contends that the contract in dispute should be treated no differently than one for the manufacture of eyeglasses, rugs or printed tickets, all of which would be treated as contracts for materials, not services. However, even assuming that contracts for those items would properly be considered contracts for materials rather than services, the Secretary could rationally distinguish a contract for keypunching cards from them. It appears to this Court that the primary function of the keypunching contract is to compile certain information from the Government's own source records and to translate it into a language which can be interpreted by one of the Government's own computers. When the data is returned to the Government translated into "computer language", it is fed into the computer where it may be stored and recalled whenever necessary. Thus, it appears that what the Government is primarily buying is translation. The punch cards and tape are merely a product manifesting the service. An analogy would be a contract to translate certain documents of a Government agency into a foreign language which uses different alphabetical characters, such as Russian or Chinese. In order to complete his task, the translator would, of course, have to write down the translated passages. Just as in the keypunching case, the "finished product" would be a material item, in this instance a manuscript. Yet it could not seriously be asserted that the translation contract was one for materials simply because the finished product is in material form. Another analogous situation would be a contract to perform a census. Here also the "finished product" would be a material item, a compilation of statistical data. Here also it would be unrealistic to suggest that the contract was primarily one for materials rather than services.

■ Concededly the analogies are far from exact and undoubtedly the level of skill required to translate English to Russian or to conduct a census properly is much greater than that required to punch data processing cards. However, the analogies do serve to illustrate that many contracts for services will involve some material end-product as a manifestation that the service was performed, and that where the value of the material returned, be it paper sheets or punched cards, is minuscule in relation to the labor expended, the contract can be treated as one for services.[6] Thus, there is a rational basis for the Secretary's determination that a contract for keypunching data processing cards is essentially one for services within the meaning of the Act.

■ .The next issue for review is the Secretary's determination that keypunch operators are "service employees" within the meaning of the Act. The Court concludes that they are not for reasons that will follow. The Act defines service employee as:

> "Guards, watchmen, and any person engaged in a recognized trade or craft, or other skilled mechanical craft, or in unskilled, semi-skilled, or skilled manual labor occupations; and any other employee including a foreman or supervisor in a position having trade, craft, or laboring experience as the paramount requirement; and shall include all such persons regardless of any contractual relationship that may be alleged to exist between any contractor or subcontractor and such persons." 41 U.S.C. § 357(b).

The Government contends that the use of the words "any" and "all" in the definition evidences a legislative intent to give an expansive scope to the term "service employee." The Court cannot

---

6. In fact Descomp concedes that in the instance where the data is to be recorded on magnetic tape, the tapes are supplied by the Government, so at least in some cases no material is supplied by the contractor. (Trial Transcript ("Tr.") 55.

agree. The use of these words when read in the context in which they are used is simply too ambiguous to determine the legislative intent, one way or the other. The Government also points to the remarks of the President when approving the 1972 Amendment to the Act wherein he stated that computer services were typical of services covered by the Act.[7] The President's other examples of typical services were food service, custodial, grounds maintenance and support services at military installations. Since all of the latter services would of necessity be performed at Government installations, it is apparent that the "computer services" that the President contemplated were those to be performed at the Government installation, such as computer repairs and maintenance. Since keypunch operations normally are performed at the contractor's place of business rather than at the Government installation, the President's remarks lend no support to the Government's position that the President intended keypunch operations to be included in "computer services."

The Government also urges this Court to attach great significance to Congress' failure to narrow the definition of "service employee" by the 1972 Amendment as suggested by the Department of Labor. The Government contends that the inaction of Congress should be interpreted as an indication of its intent to afford a broad meaning to the term "service employee." The Court does not consider Congressional inaction indicative of its intent one way or the other. While it may be that Congress' refusal to act reflected a desire to afford a broad meaning to "service employee," it is just as likely that Congress refused to act because it considered the definition narrow enough as originally drawn. In short, Congress' inaction in response to a suggestion by the Department of Labor to narrow the definition of "service

employee" is simply too ambiguous to be indicative of its intent.

The Court's determination that Congress did not intend to include occupations such as keypunch operators within the meaning of "service employee" is based on the statement of the then Solicitor of Labor Charles Donahue before the Special Subcommittee on Labor of the Committee on Education and Labor, House of Representatives on August 5, 1965, and the regulations adopted by the Department of Labor pursuant to the Act. Donahue stated:

"The standards set forth in HR 10238 would apply to guards, watchmen, and employees in jobs of the type for which wage rates are set by individual agency wage boards when the workers are employed directly by the Government. The employees are, as you know, employees in trades, crafts, or manual labor occupations, including supervisors, often referred to as 'blue collar' workers." [8]

Also in the Regulations of the Department of Labor the following language is found:

"The breadth of the definition [of 'service employee' in 41 U.S.C. § 357(b)] is indicated by the fact that much of its language is identical with that in the Classification Act Amendment of 1954 (5 U.S.C. § 1082(7)) defining the so-called 'blue collar workers' or 'wage board employees' in the Federal service. The legislative history indicates that such employees are the 'counterpart' in Federal service of the 'contractors' employees to whom the Act was intended to extend. (H. Rept.No.948, 89th Cong. 1st Sess. p. 2). The definition therefore includes as service employees those classes of employees described in some detail in the Handbook of Blue Collar Occupational Families and Series issued by the Civil Service Commission (the lat-

---

7. Daily Labor Report, BNA, Oct. 11, 1972.

8. Hearing before the Special Subcommittee on Labor of the Committee on Education and Labor, House of Representatives, 89th Cong., 1st Sess. on HR 10238, p. 4.

est being October 1961)." 29 CFR § 4.113(b).

From the foregoing it appears that the criterion to be applied in determining whether a given worker is considered a "service employee" within the meaning of the Act is to see how his or her counterpart in Federal service would be classified. If an occupation is conferred a "wage board" classification, it will be considered "blue collar" and employees of government contractors performing those services will be considered "service employees" within the meaning of the Act. If an occupation is classified as "general schedule" in the Federal service, it will be considered "white collar" and employees of government contractors with comparable job descriptions will not be "service employees" within the meaning of the Act. According to the U.S. Civil Service Commission's Handbook of Occupational Groups and Series of Classes keypunch operators are classified as general schedule employees in the General Administrative, Clerical, and Office Services Group, GS–300 series. The Handbook uses the following language to define the group:

"This group includes all claims of positions the duties of which are to administer, supervise, or perform work involved in management analysis; stenography, typing, correspondence, and secretarial work; mail and file work; the operation of office appliances; the operation of communications equipment, use of codes and ciphers, and procurement of the most effective and efficient communications services; work involved in the technical phases of photographic and art processes, such as engrossing, blueprinting, photostating, and offset duplicating camera operating and platemaking; and other work of a general clerical and administrative nature." [9]

One of the subgroups in the GS–300 series is Card Punch Operation Series GS–356 described as follows:

"This series includes all positions the duties of which are to supervise or perform card punch work either solely or in combination with clerical work, except when the clerical work requires such specialized experience or training that this constitutes the paramount qualification requirement for the position."

Thus, in terms of the criterion expressed in 29 CFR § 4.113(b) and in the suggestions of the Solicitor of Labor in support of the original Act, keypunch operators are regarded as "white collar" workers and not "service employees" within the meaning of the Act. In addition, the Handbook of Blue Collar Occupational Families and Series issued by the Civil Service Commission, also referred to as a criterion in 29 CFR § 4.-113(b), does not include a classification for keypunch operators, confirming that they are not considered "blue collar" workers.

The Court concludes that the significant legislative history and the terms of the applicable regulations of the Department of Labor establish that Descomp's keypunchers are not employees within the meaning of the Act. The Secretary cannot now take a position contrary to that expressed in regulations published in the Code of Federal Regulations ("CFR"). 44 U.S.C. § 1510 provides in pertinent part:

"(a) The Administrative Committee of the Federal Register, with the approval of the President, may require, from time to time as it considers necessary, the preparation and publication in special or supplemental editions of the Federal Register of complete codifications of the documents of each agency of the Government having general applicability and legal effect, issued or promulgated by the agency by publication in the Federal Register or by filing with the Administrative Committee, and are relied upon by the agency as authority for, or are in-

9. In the pre-trial order, the parties stipulated that the work of keypunchers would be categorized as clerical. Docket Item 21, ¶ C. 2.

volved or used by it in the discharge of, its activities or functions.

. . .

"(b) A codification published under subsection (a) of this section shall be printed and bound in permanent form and shall be designated as the 'Code of Federal Regulations.'"

Publication in the CFR of the Department of Labor Regulations which pertain to implementation of the Act give them the force and effect of law and must be followed by the Secretary when making a determination of the applicability of the Act to a proposed bid solicitation.

"[Rules published in accordance with the Federal Register Act, 44 U.S.C. §§ 1501–1511,] have the force and effect of statute or law and are binding on those persons publishing them as well as on the general public, until such time as they be repealed or modified.

\* \* \* \* \* \*

"The public has a right to know what treatment to expect both substantively and procedurally from its government and should not be subject to the shifting whims of a government administrator." Northern States Power Co. v. Rural Electrification Administrator, 248 F.Supp. 616, 622–623 (D.Minn. 1965) reversed on other grounds 373 F.2d 686 (C.A. 8, 1967), cert. den. 387 U.S. 945, 87 S.Ct. 2079, 18 L.Ed. 2d 1332 (1967); see also United States ex rel. Accardi v. Shaughnessy, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954).

As previously stated, the Secretary's determination that Descomp's keypunchers are "service employees" within the meaning of the Act must be upheld if it has warrant in the record and a reasonable basis in law. Since the Secretary's determination is contrary to the Department of Labor's regulations published in the CFR, the Court finds that there is no reasonable basis in law to support his determination, and it must be set aside.

■ Therefore, although Descomp is providing a "service" within the meaning of the Act by transcribing data onto punch cards and magnetic tape in coded form, its keypunch operators are not "service employees" within the meaning of the Act. In short, the Act is not applicable to the contract presently in dispute.

■ Furthermore, even if the Act did apply to keypunch operators, the Court concludes that the applicable wage determination with respect to Descomp would be those prevailing for keypunch operators in the Wilmington, Delaware area, not the Washington, D.C. area.

As noted previously, government contractors who bid on contracts covered by the Act must agree to pay the wages prevailing in the locality for comparable workers. The opposing sides here take issue with whether Congress meant the locality of the Government installation or the locality of the contractor's business in instances where they are not identical. The Government advances four reasons why the Secretary's decision should not be disturbed. First, it argues that the use of the singular word "locality" indicates that Congress must have been referring to the Government installation since it was aware that there would be multiple bidding contractors from multiple localities. The Court is unable to agree with this contention. Since any one of the contractors most likely would be performing the service in a single locality if his bid were successful, Congress was just as likely laying down a requirement that each and every contractor was to observe the prevailing wage rate in the locality where the work was to be performed. Therefore, very little can be determined of Congress' intent from the use of the word "locality."

Second, the Government argues that Congress must have intended that wages be based on those prevailing in the locality of the Government installation because it was aware that the Secretary does not have the manpower capabilities to make wage determinations for the job description in question in all regions

of the United States within the 30 day referral period contained in the regulations.[10] Since, the argument goes, the Congressional purpose for the Act was to prevent government contractors from paying substandard wages to their employees, to permit a contract to be awarded when the Secretary has been unable to make the appropriate wage determination in time would defeat the implementation of the Act.[11] Whether or not the Secretary lacks the manpower capabilities to make timely wage rate determinations has not been established by any evidence introduced into the record, and the Court is reluctant to assume the underlying fact which serves as a basis for its major premise, i. e., that Congress was aware that the Secretary lacked manpower capabilities to make the necessary wage determinations.

Third, the Government argues that the legislative history establishes that Congress intended to allow the Secretary to make a more flexible determination of "locality" under the Act than he was permitted under the Davis-Bacon Act.[12] The "flexibility" referred to in the hearings, however, was to enable the Secretary to determine localities for wage level determinations which would not be bound by municipal or state boundaries.[13] For example, the Washington, D.C. area wage levels would include nearby Virginia and Maryland counties. As another example, Philadelphia area wage levels would include several suburban Pennsylvania counties, and parts of New Jersey and Delaware. Congress' intent to grant the Secretary more latitude in

determining the locality for the purpose of wage level determinations sheds no light on the issue before the Court, whether "locality" refers to the location of the Government installation or to where the work is to be actually performed.

Fourth, the Government argues that where a duty to act rests upon terms of doubtful meaning, the Courts should defer to the expertise of the agency to reach the intended meaning of the term. There are two answers to this however. First of all, the Court is not without guidance as to the Congress intent in using the term "locality." The aforementioned Solicitor of Labor Donahue stated during the hearings:

"I address myself to the provisions on page 2 of the bill as it was reported in the House of Representatives, paragraph No. 2 which provides for the determination of prevailing wage rates by the Secretary of Labor on the basis of those prevailing for service employees in the locality.

\* \* \* \* \* \*

"Now the word 'locality' is comparable to the words in the Davis-Bacon Act; city, town, village, or any other political division of the state in which the contract work is to be performed." Senate Report, p. 11.

Therefore the presence of significant legislative history, the remarks of the then Solicitor of Labor, indicate that "locality" referred to the place where the work was to be performed. In addition, the Court has the benefit of the ex-

---

10. 41 CFR § 1–12.095–3 provides:
(a) Not less than 30 days prior to any invitation for bids, requests for proposals, or commencement of negotiations for any contract exceeding $2,500 which may be subject to the Act, the contracting agency shall file with the Office of Special Wage Standards, Employment Standards Administration, Department of Labor, its notice of intention to make a service contract.

11. 29 CFR § 4.5(b)(1) provides that where the Secretary has not made wage and fringe benefit determinations for a prospective group of service employees, the minimum

wage provisions under the Fair Labor Standards Act of 1938, 29 U.S.C. §§ 201–219, shall apply.

12. 40 U.S.C. § 276a requires contractors on Government building contracts to pay its employees the prevailing wage rates in the construction industry in the locality where the work is to be performed.

13. Hearing before the Subcommittee on Labor of the Committee on Labor and Public Welfare, United States Senate, 89th Cong., 1st Sess., on H.R.10238 ("Senate Report"), pp. 12–13.

pertise of GAO, which rendered an opinion upon Descomp's protest. Pursuant to 4 CFR part 20, GAO enters opinions on protests by unsuccessful bidders on Government contracts. In its opinion in the instant case, GAO stated that it had examined the legislative history and concluded that the locality intended by Congress was the area encompassing the location where service employees are actually performing a service contract. It also stated that the Secretary's definition of locality was having an adverse impact on Government procurement of services by increasing the cost,[14] since bids submitted by contractors from geographic areas having a lower cost of living will of necessity be higher because of the higher wages they will be required to pay their employees.

The Secretary's interpretation of the term "locality" puts the Act in conflict with 41 U.S.C. § 253(a) which provides in part:

". . . specifications and invitations for bids shall permit such full and free competition as is consistent with the procurement of types of property and services necessary to meet the requirements of the agency concerned."

This statute evidences a Congressional intent that competitive bidding be used in order to obtain products and services for the Government at the lowest possible cost. The Secretary's interpretation of "locality" which in some instances will require a bidding contractor to agree to pay his employees wages higher than those prevailing in the geographic region where the service is performed frustrates the policy behind Congress' passage of 41 U.S.C. § 253(a). On the other hand, when "locality" is interpreted to mean the situs where the work is actually performed there is no conflict between the two statutes. As noted previously, the Act was passed to prevent government contractors from paying substandard wages to their employees working on a Government contract. For complex economic, sociological and political reasons, the levels of wages and prices tend to reflect one another in a geographic area. Therefore a requirement that a contractor pay wages to his employees at levels prevailing in his locality for workers similarly employed will ensure that his employees are able to enjoy a standard of living comparable to that of similarly employed workers elsewhere in the country. Using the instant situation as an example, it takes no special knowledge to realize that a keypunch operator in Wilmington earning wages below Washington levels may nonetheless have an equal or greater purchasing power than his Washington counterpart because of the higher cost of living there. Thus, an interpretation of "locality" as used in the Act as the place of performing the service is consistent with the policy of 41 U.S.C. § 253(a) because contractors located in a low cost of living area are not forced to include in their bid calculations the prevailing wages in a higher cost of living area. At the same time the policy of the Act is not frustrated by this interpretation because requiring contractors to pay their employees at wages prevailing in their own localities will be sufficient to ensure that those employees are able to enjoy a standard of living comparable to similarly employed workers elsewhere.

■ In view of the significant legislative history, of the opinion rendered by GAO and the Congressional policy to use competitive bidding to obtain products and services for the Government at the lowest possible cost, the Court concludes that "locality" as used in the Act refers to the area where the services are actually performed so that if the Act applied to the contract in the instant case, the appropriate wages to be paid by Descomp to its keypunch operators would be those prevailing in the Wilmington, Delaware area rather than those in the Washington, D.C. area.

14. Comp.Gen.Op. B–178400, p. 7.

5. *Damages*.

The Court having concluded that GSA incorrectly required Descomp to agree to pay its keypunchers at wage levels prevailing in the Washington, D.C. area in order to bid on the contract here involved, the remaining question is the amount of damages, if any, that Descomp is entitled to recover.

 Descomp has asked $3,600, the cost of preparing its bid, $3,000, the cost of protesting the wage provision at the administrative level and $3,000, the cost of litigating this case in this Court. With respect to the costs of protesting and the attorney fees incurred in this litigation, no recovery can be granted. The normal rule is that such litigation expenses, in the absence of express statutory authorization or any court-made exception, must be borne by the party incurring the expenses. Since Descomp has pointed to no statute or court-made exception authorizing the award of the protest costs and attorney fees, they will not be allowed.

The remaining item sought is bid preparation costs. Descomp relies on Keco Industries, Inc. v. United States, 428 F.2d 1233, 192 Ct.Cl. 773 (1970) for the proposition that a bidder whose bid has not been fairly considered is entitled to recover its costs of preparing its bid as damages. In a subsequent opinion Keco Industries v. United States, 492 F. 2d 1200 (Ct.Cl.1974) (*Keco II*) the Court of Claims set forth certain criteria to be considered in determining whether or not bid preparation costs should be awarded. The Government contends that the instant situation does not merit any of the criteria listed in *Keco II*.

Before considering the criteria expressed in *Keco II*, however, the Court must consider a fundamental difference between the instant action and other suits brought by unsuccessful bidders on Government contracts. In the other cases the plaintiff complained that his bid was not considered fairly, that some arbitrary conduct resulted in his bid being declared unresponsive or that some favoritism resulted in the bid being awarded to another. In the instant situation, the alleged wrongful conduct was to be found on the face of the solicitation for bids. Descomp was aware of the wage imposition prior to bidding. In fact Descomp filed a protest first and then submitted a bid which conformed to the solicitation. (Tr. 48). The rationale announced in *Keco* was that "every bidder has the right to have his bid honestly considered by the Government, and if this obligation is breached, then the injured party has the right to come into court to try and prove his cause of action." 428 F.2d at 1237. A potential contractor is induced to bid by the understanding between himself and the Government that his bid will be fairly considered if it is responsive to the bid solicitation. In the event of a breach of this understanding, the damages that flow from the breach are his bid preparation costs expended in the reliance that his bid would be considered fairly.

Here, however, Descomp cannot claim to have relied upon a bid solicitation to its detriment in the cost of preparing a bid only to learn later that an arbitrary condition was being imposed on the bids. Indeed, Descomp filed its protest first. Therefore, it cannot claim damages based on reliance to its detriment.

 If Descomp had been required to file a bid in order to have standing to protest the wage provisions to the agency and to GAO, it might be entitled to damages. That question need not be determined, however, since there is nothing in the record to indicate that such a requirement exists, nor does a reading of the appropriate regulations, 41 CFR § 1–2.407–8 and 4 CFR, Part 20 reveal with any certainty that such a condition exists. Therefore it has not been demonstrated to the Court that the expenditure of bid preparation costs was related to the arbitrary wage condition placed in the solicitation for bids, and Descomp's request for bid preparation costs will also be denied.

The above shall constitute the findings of fact and conclusions of law required by Rule 52(a), F.R.Civ.P.

A judgment will be entered in accordance with this opinion.