**SOUTHERN PACKAGING AND STORAGE COMPANY, Incorporated,
Plaintiff,**

v.

**The UNITED STATES of America,
Defendant.**

**Civ. A. No. 78–1424.**

United States District Court,
D. South Carolina,
Columbia Division.

Oct. 10, 1978.

David W. Keller, Jr., Florence, S. C., William W. Goodrich, Jr., Matthew S. Perlman, Washington, D. C., for plaintiff.

Jack L. Marshall, Asst. U. S. Atty., Columbia, S. C., Michael Trovarelli, Asst. Counsel, Defense Personnel Support Center, Philadelphia, Pa., David B. Dempsey, Defense Logistics Agency, Alexandria, Va., Arthur Bolstein and Jack A. Diamond, Dept. of Labor, Mark F. Evens, Dept. of Justice, General Litigation Section, Washington, D. C., for defendant.

## FINDINGS OF FACT

## CONCLUSIONS OF LAW AND ORDER

CHAPMAN, District Judge.

The plaintiff in this action, Southern Packaging and Storage Company, Incorporated, first came before this Court on August 24, 1978 seeking a preliminary injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure. On August 28, 1978 this Court granted plaintiff's request and enjoined the United States of America and its agents, the Defense Personnel Support Center (hereinafter D.P.S.C.), the Defense Logistics Agency (hereinafter D.L.A.) and Department of Labor (hereinafter D.O.L.) from awarding any contract in response to Solicitation No. DLA13H–78–R–8947, dated August 1, 1978.

In granting injunctive relief this Court was convicted that Southern Packaging and Storage had met the three pronged test established in *Blackwelder Furniture Co. v. Seilig Mfg. Co., Inc.*, 550 F.2d 189 (4th Cir. 1977). Specifically this Court found that in light of recent Congressional action, grave questions were raised as to the appropriate limits of coverage under the Walsh-Healey Public Contracts Act, 41 U.S.C. § 35 *et seq.* It was also determined that denial of the requested relief would result in irreparable harm, in that that plaintiff would be put to a Hobson's choice between paying inflated wage rates and thus losing its natural competitive advantage or withdrawing entirely from bidding process for ration assembly contracts. Finally, it was decided that the public interest would be furthered by restraining the bid solicitation due to its inflationary potential. This potential was a direct result of the D.O.L. decision to treat the bid solicitation as one arising under the Service Contract Act, 41 U.S.C. § 351 *et seq.* The public interest was also threatened by the possibility that the petitioner would withdraw from all D.P.S.C. solicitations. Since the bulk of the petitioner's business is performed pursuant to government contract, withdrawal from the bid process would result in closing the assembly plant or "laying-off" a significant number of employees.

Having granted the temporary restraining order, this Court held a trial on the merits to determine whether this solicitation was subject to the Service Contract Act and whether the D.O.L. determination of "locality" was appropriate. These issues were tried without a jury on September 27, 1978 in Columbia, South Carolina. After hearing the testimony, reviewing the exhibits and briefs, and studying the applicable law, this Court pursuant to Rule 52 of the Federal Rules of Civil Procedure, makes the following:

## FINDINGS OF FACT

1. The plaintiff, Southern Packaging and Storage Company, Incorporated, has its principal place of business in Mullins, South Carolina and is incorporated under the laws of South Carolina. Southern Packaging has for the past 34 years been engaged primarily in the business of assembling the component parts of the "Meal Combat Individual" (M.C.I.) field rations (formerly C rations) under contract with the Defense Logistics Agency (D.L.A.), and/or the U. S. Army.

During all these years plaintiff has operated under Walsh-Healey and paid the wages required with no complaints from its employees or any agency of the Government. D.L.A. thought the present bids should be under Walsh-Healey until D.O.L. ruled otherwise.

2. Pursuant to its contracts with D.L.A., Southern Packaging has in the past performed the following functions: (a) inspect component parts while they are on railroad cars, (b) unload conforming goods, (c) mark goods and store them in warehouses, (d) inspect accessory pack components, (e) assemble and seal accessory packs, (f) prepare B-unit cans, (g) seal B-unit cans, (h) place dividers in menu carton, (i) place the additional units into meal cartons, (j) place twelve meal cartons into master shipping container, (k) seal master shipping containers, (l) place sleeve over shipping container, (m) cover container with non-metallic strap, (n) pack 48 cases onto wooden pallets, (o) strap down and cap these cases securely to the pallets. When the plaintiff performed the above list of assembly steps, its obligations under the "Meal Combat Individual" contract were discharged. The food used in M.C.I. is not furnished by plaintiff but shipped to its plant from suppliers under other government contracts.

3. The performance required of a successful bidder under the solicitation in question (No. DLA13H–78–R–8947) would be identical to that described in the preceding statement.

4. In order to meet its previous M.C.I. contracts, Southern Packaging employed the following mechanized devices: (a) de-palletizer, (b) numerous conveyor belts, (c) seaming head, (d) case sealer and (e) case tying machine. Each of these devices is suitable for alternative operations which are unrelated to M.C.I. assembly.

5. Southern Packaging employs 551 workers, 84% of whom live in Marion County, South Carolina. Ninety percent of these employees are black and 87% are female. Many of these employees are illiterate and the vast majority are unskilled. Costs attributable to labor account for 55% of the cost of production. Under previous M.C.I. contract solicited under the Walsh-Healey Act, Southern Packaging produced at a per carton cost of $1.45. The plaintiff's per carton cost under the proposed minimum wage rate, as determined pursuant to the Service Contract Act, would be $3.00. The total contract cost would increase from approximately 3 million dollars to 8 million dollars, if the M.C.I. solicitation is governed by the Service Contract Act and the proposed nationwide minimum wage rate. The proposed minimum wage would increase one-half plaintiff's employees wage by 75%—100% and the remainder by 50%—75%.

6. The plaintiff has supplied the following raw materials while performing under prior M.C.I. contracts; (a) adhesive for master shipping containers, (b) non-metallic strap for master shipping container, (c) covering for 48 case pallet, (d) paper bags used to cover one-half of a railroad car load of M.C.I., (e) wooden pallets, (f) ink to cover erroneous container markings. Each of the integral parts of the individual M.C.I. menus, including all food and accessory components, is provided by the Defense Logistics Agency.

7. In calculating the prevailing wage rates as required by the Service Contract Act, representatives of the Department of Labor have used a mean average of wages paid for work comparable to that which is required under the proposed solicitation. As to the geographic "locality" used in arriving at the mean wage rate, the D.O.L. Division of Service Wage Determination has used the "standard metropolitan statis-

tical area" (S.M.S.A.) of the area for contract performance in 98% of the requested determinations. Less than one-half of 1% of these determinations have resulted in a "nationwide" minimum wage rate for bid solicitation purposes. The solicitation in the instant case included a "nationwide" wage rate determination issued by D.O.L. on June 2, 1978.

8. In 1975 an interagency task force recommended that in arriving at minimum wage determinations, a two step process be employed. The first step being an affirmative effort by the contracting agency to discover the geographic location of interested bidders. Under the second step, the agency would request wage rate determinations for the localities of those parties showing interest in the solicitation. The Secretary of Labor rejected this approach. Representatives of D.O.L. now utilize a "competitive" technique to arrive at the prevailing wage rate for each solicitation. This technique depends upon three factors: (a) bidder abstracts from prior solicitations, (b) parties on the present bid solicitation list and (c) multiple geographic awards or specific geographic limitations. Only when it is impossible to determine the location of contract performance is a "nationwide" rate employed.

9. The solicitation at issue was sent to fifty-eight firms. These prospective bidders were located in seventeen states. Before the bid proposal was mailed, D.P.S.C. sent a list of 12 firms to the D.O.L. Division of Service Wage Determination, representing with reasonable certainty the group from which the successful bidder would come. These firms were located in eight states or more specifically, eleven counties. Based on prior historical application of the Service Contract Act and D.O.L agency policy, the Division of Service Wage Determination refused to issue determinations for the geographic areas represented by these prospective bidders. In addition the Director of the Division of Service Wage Determination felt that issuing minimum wage determinations based on D.P.S.C. projections would be inappropriate due to the similarity to the two step bid analysis recommended by the task force in 1975 and later rejected by the Secretary of Labor. The D.O.L. issues approximated 36,000 wage rate determinations each year or roughly 3,000 per month. D.O.L. could have issued wage determinations for the eleven counties requested by D.P.S.C. with little difficulty.

## CONCLUSIONS OF LAW

■ A. This Court has jurisdiction over plaintiff's claim for injunctive and declaratory relief. Jurisdiction exists under 28 U.S.C. § 1331(a), in that this is an action arising under the laws of the United States in which the amount in controversy exceeds the sum or value of $10,000.00 exclusive of costs or interest. Jurisdiction is also grounded in the Administrative Procedure Act, 5 U.S.C. § 702, since this Court concludes that Southern Packaging is a party "aggrieved by agency action". This Court's authority to review agency action is not precluded by statute or committed to agency discretion as required by 5 U.S.C. § 701(a).

In arguing that Southern Packaging lacks standing to bring this suit, the defendant's reliance on *Perkins v. Lukens Steel Co.*, 310 U.S. 113, 60 S.Ct. 869, 84 L.Ed. 1108 (1940) is ill founded. Subsequent cases have implicitly rejected the narrow interpretation of standing by the Court in *Perkins. Abott Laboratories v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); *Scanwell Laboratories, Inc. v. Shaffer*, 137 U.S.App.D.C. 371, 424 F.2d 859 (1970). The reasoning of these cases is particularly convincing since at the time *Perkins* was decided the Administrative Procedure Act had not yet been adopted by Congress. The *Scanwell* case has been approved by the United States Court of Appeals for the Fourth Circuit in *William F. Wilke, Inc. v. Department of Army*, 485 F.2d 180 (4th Cir. 1973).

■ The plaintiff in the case at bar is clearly "aggrieved" and "adversely affected" within the meaning of 5 U.S.C. § 702. It is of no moment that this action was

commenced before completion of the bid solicitation. *Wheelabrator Corp. v. Chaffee*, 147 U.S.App.D.C. 238, 455 F.2d 1306 (1971). Plaintiff's injury is not speculative. There has been ample proof of the economic impact that the application of the Service Contract Act would have on plaintiff's business. Clearly the plaintiff in this action possesses the requisite standing to challenge the alleged irregularities in the bid solicitation process.

B. The appropriate standard for judicial review of agency action is set out in 5 U.S.C. § 706, which provides in part:

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning and applicability of the terms of an agency action. The reviewing court shall—

.  .  .  .  .

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with law;

The level of judicial scrutiny applied by the courts is somewhat expanded where the primary issue is one of statutory interpretation. In *Barlow v. Collins*, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970); the Court was confronted with the task of defining the phrase "making a crop". In reviewing the interpretation of the Secretary of Agriculture the Court found:

On the contrary, since the only or principal dispute relates to the meaning of the statutory term, the controversy must ultimately be resolved, not on the basis of matters within the special competence of the Secretary, but by judicial application of canons of statutory construction. See *Texas Gas Transmission Corp. v. Shell Oil Co.*, 363 U.S. 263, 268–270, 80 S.Ct. 1122, 1126–1127, 4 L.Ed.2d 1208, 1211–1213. "The role of the courts should, in particular, be viewed hospitably where  .  .  .

the question sought to be reviewed does not significantly engage the agency's expertise. '[W]here the only or principal dispute relates to the meaning of the statutory term'  .  .  . [the controversy] presents issues on which courts, and not [administrators], are relatively more expert." *Hardin v. Kentucky Utilities Co.*, 390 U.S. 1, 14, 88 S.Ct. 651, 19 L.Ed.2d 787, 797 (Harlan, J., dissenting).

The case at bar presents issues of statutory construction and it is the duty of this Court to determine whether the Secretary of Labor has construed the applicable statutes "in accordance with law."[1]

C. The Secretary of Labor's determination that the assembly of M.C.I. rations falls within the coverage of the Service Contract Act, 41 U.S.C. § 351 *et seq.* is not contrary to law. It is the plaintiff's position that its assembly operations under the M.C.I. contracts render it a "manufacturer" and as a manufacturer, subject to the provisions of the Walsh-Healey Act, 41 U.S.C. § 35 *et seq.* If this were true plaintiff's work on the M.C.I. contracts would be specifically exempt from coverage under the Service Contract Act in paragraph (2) of Section 7.

In order for a party engaged in assembly operations to be considered a "manufacturer" within the meaning of the Walsh-Healy Act, its performance under the contract must conform to the definition found at 41 CFR § 50–206.52(b)(1):

"Assembly" means piecing or bringing together various interdependent or interrelated parts or components so as to make an operable whole or unit.  .  .  . A firm which produces final items on its premises by assembling component parts, all or some of which have been purchased from others, will generally be considered to be a "manufacturer" where it performs a series of assembly operations utilizing machines, tools and workers which constitute substantial and significant fabrication or production of the desired product. The qualifications of a bidder as a

---

1. See also, *NLRB v. Hearst Publications, Inc.*, 322 U.S. 111, 88 L.Ed. 1170, 64 S.Ct. 851.

manufacturer who proposes to "assemble" must be decided on the basis of all the facts and circumstances surrounding a particular procurement.

Applying this definition to the case at bar, this Court finds that the operations performed by the plaintiff are not sufficient to constitute manufacturing within the meaning of the Walsh-Healey Act.

■ While there exists additional statutory language which has been helpful in reaching this decision,[2] the basic test must depend upon the facts of each case. In determining whether a party is a "manufacturer" the crucial factor is the character of the goods following the alleged manufacturing operation, as compared to their condition upon arrival at the processing facility. Necessarily many products required by the government go through several processing stages before reaching completion. The problem then becomes one of determining which of these processing stages exceed the "minimal operations" standard[3] so as to qualify as a manufacturer under Walsh-Healey rather than simply a service under Service Contract Act.

By analyzing the functional utility of the item being procured before each processing step, the Court can in most cases determine whether manufacturing has in fact taken place. In the instant case the individual menu components were functionally complete upon arrival at the plaintiff's facility, with the possible exception of the B-unit item. While the packaging of the components made them easier to distribute, their functional character remained unchanged.

Other factors to be considered in deciding whether a particular process qualifies as "manufacturing" include: the portion of the total item cost attributable to the processing operation in question and the extent to which machinery is necessary to complete the operation.

While the test applied by this Court has never been enunciated by a reviewing court, the reasoning employed herein has been implicit in several prior decisions. *Curtis-Wright Corporation v. McLucas*, 364 F.Supp. 750 (D.N.J.1973); *U. S. v. Stocks Lincoln-Mercury, Inc.*, 307 F.2d 266 (10th Cir. 1962); *Descomp, Inc. v. Sampson*, 377 F.Supp. 254 (D.Del.1974); *U. S. v. Russell*, 250 F.Supp. 2 (D.N.Y.1965); *Kentron Hawaii, Ltd. v. Warner*, 156 U.S.App.D.C. 274, 480 F.2d 1166 (D.C.Cir. 1973). By focusing on the character of the item, both before and after processing, many of the cases falling in the gray area between Walsh-Healey and the Service Contract Act can be more easily resolved.

Plaintiff's activities in the case at bar are simply insufficient to constitute manufacturing. As pointed out earlier the component parts were not altered in any real way by the assembly operations. While the plaintiff utilizes extensive machinery in its plant this factor alone is not enough to render it subject to Walsh-Healey. In reaching its decision this Court also considered the *de minimis* character of the product additions purchased by the plaintiff and the percentage of the total item cost attributable to plaintiff's assembly process.

D. The Secretary of Labor's determination that "locality", within the meaning of the Service Contract Act, included the entire continental United States is "not in accordance with law". 5 U.S.C. § 706(2)(A) and *Kentron, Hawaii, Ltd. v. Warner, supra.*

The Secretary of Labor through his representatives issued Wage Determination 78–523 in response to a request from D.P. S.C. on June 2, 1978, finding that "locality," for the purposes of the M.C.I. solicitation at issue, included the entire United States. This determination was erroneous and if accepted would lead to absurd results contrary to Congressional intent.

By applying a nationwide wage determination to this solicitation, the Secretary has taken a position in direct contravention of established Congressional policy as found in 41 U.S.C. § 253(a). The gist of this statute

**2.** See also, 41 CFR § 50–206.52(b)(2), (6)(3), (c), (d).

**3.** 41 CFR § 50–206.52(c).

is that, in all government procurements, competition should be encouraged. The Court in *Descomp, Inc. v. Sampson, supra,* discussed the issue of "locality" as it relates to 41 U.S.C. § 253(a):

> This statute evidences a Congressional intent that competitive bidding be used in order to obtain products and services for the Government at the lowest possible cost. The Secretary's interpretation of "locality" which in some instances will require a bidding contractor to agree to pay his employees wages higher than those prevailing in geographic region where the service is performed frustrates the policy behind Congress' passage of 41 U.S.C. § 253(a). On the other hand, when "locality" is interpreted to mean the situs where the work is actually performed there is no conflict between the two statutes.

Clearly if Congress had intended for all bidders on government service contracts to pay an established minimum wage rate for the entire United States there would have been no need to include the language in 41 U.S.C. § 351(a)(1) pertaining to "locality". If the Secretary's contention is accepted this language would be rendered mere surplusage.

At trial Mr. Raymond Camrath of the Division of Service Wage Determination urged this Court to accept a flexible meaning of the term "locality". Certainly this is warranted based on the definitional language at 29 CFR § 4.163:

> The term "locality" has reference to geographic space. However, it has an elastic and variable meaning. . . .

The Court in *Descomp* when confronted with the same argument found:

> The "flexibility" referred to in the hearings, however, was to enable the Secretary to determine localities for wage level determinations which would not be bound by municipal or state boundaries. For example, the Washington, D. C. area wage level would include nearby Virginia and Maryland counties.[4]

Mr. Camrath testified that in 98% of the wage rate determinations the area defined as the "locality" was the "standard metropolitan statistical area" (S.M.S.A.), which included the place of performance. A flexible or elastic definition of "locality" was necessitated by those cases where the S.M.S.A. cut across state lines, such as the example of Washington, D. C. as used by the Court in *Descomp.* This Court is not persuaded that this same flexibility allows a result so ludicrous as the consideration of the continental United States as a "locality."

In determining whether the Secretary's interpretation of "locality" is clearly erroneous and not in accordance with law, this Court is bound by the well established canon of statutory construction which requires that words should be accorded their ordinary and common meaning. *Malat v. Riddell,* 383 U.S. 569, 86 S.Ct. 1030, 16 L.Ed.2d 102; *Bouie v. City of Columbia,* 378 U.S. 347, 12 L.Ed.2d 894, 84 S.Ct. 1697; *Klein's Estate v. C. I. R.,* 507 F.2d 617 (7th Cir. 1974); *American Community Builders, Inc. v. C. I. R.,* 301 F.2d 7 (7th Cir. 1962). Applying this rule the unavoidable result is that the Secretary's interpretation cannot be accepted. While the term "locality" is indefinite and lends itself to varied interpretations common usage dictates a more restricted construction than that urged by the Secretary of Labor.

■ In certain specific fact patterns[5] a nationwide determination may be justified but the instant case is not of that genre. This Court adopts the decision in *Descomp* which held:

> Therefore the presence of significant legislative history, the remarks of the then Solicitor of Labor, indicate that "locality"

---

4. Hearing before the Subcommittee on Labor of the Committee on Labor and Public Welfare, United States Senate, 89th Cong., 1st Sess., on H.R. 10238 ("Senate Report"), pp. 12–13.

5. *Mitchell v. Covington Mills, Inc.,* 97 U.S.App. D.C. 165, 229 F.2d 506 (1955).

referred to the place where the work was to be performed.[6]

"While this Court must accord due deference to the expertise of the Secretary of Labor, this Court is also under a higher duty to ascertain and declare the law as Congress intended it. This duty includes holding, when necessary, that the Secretary's determination has exceeded the boundaries set by Congress." *Federal Electric Corp. v. Dunlop*, 419 F.Supp. 221 (D.Fla. 1976). The Secretary's interpretation of "locality" exceeded "the boundaries set by Congress" and therefore must be rejected.

▪ E. The appropriate "locality" for the bid solicitation at issue is Marion County, South Carolina or the standard metropolitan statistical area which includes Marion County. Prior agency practice, legislative history and common sense require this result. In the instant case testimony was presented to the effect that the Service Wage Determination Division of the Department of Labor could have responded to the wage determination requests, tendered by D.P.S.C., with little or no difficulty since they involved only eleven counties. Mr. Camrath also testified that in 98% of the wage determinations involving localities, the geographic unit applied is the "standard metropolitan statistical area". This Court is of the opinion that the Department of Labor, in order to fulfill its statutory duties under the Service Contract Act, should have calculated the prevailing wage rates for the standard metropolitan statistical areas represented by the eleven counties designated in the D.P.S.C. requests. In the case of a bidder located in a county not contained within an S.M.S.A., the appropriate "locality" for wage determination purposes would be the bidder's county as determined by plant location. Based upon these separate determinations, each bidder could respond to the solicitation while at the same time preserving the competitive nature of the bid process.

The above described method of wage rate determination was refused by Mr. Camrath due to its alleged similarity with an earlier task force proposal which was rejected by the Secretary of Labor. The rejected method was the so-called "two step" process requiring an initial inquiry by the procuring agency to determine bidder interest, then a submission to D.O.L. for separate wage determinations based on the response from the earlier inquiry. Mr. Camrath's logic is inscrutable since the "competitive" method which he now employs depends upon past bidder abstracts as well as prospective bidder interest. This Court discerns little difference between the present analysis and the earlier technique rejected by the Secretary.

▪ The intent of Congress in passing the Service Contract Act was to guarantee those workers performing under federal service contracts a wage rate not less than the minimum rate established by the Fair Labor Standards Act and its subsequent amendments. Specifically the Act sought to exclude from contract solicitations those employers who paid wages at or below the subsistence level. The term "subsistence" is certainly relative in meaning. The number of dollars or rate of pay which is required to meet this subsistence level is dependent upon geographic location. Thus it appears clear that Congress intended that the wage rate paid under the Act should be tied to comparative economic conditions. This exact point was addressed in *Descomp*[7] where the Court said:

> As noted previously, the Act was passed to prevent government contractors from paying substandard wages to their employees working on a Government contract. For complex economic, sociological and political reasons, the levels of wages and prices tend to reflect one another in a geographic area. Therefore, a requirement that a contractor pay wages to his employees at levels prevailing in his locality for workers similarly employed will ensure that his employees are able to enjoy a standard of living comparable to that of similarly employed workers else-

6. *Descomp, Inc. v. Sampson, supra*, at 265.

7. *Descomp, Inc. v. Sampson, supra*, at 266.

where in the country. Using the instant situation as an example, it takes no special knowledge to realize that a keypunch operator in Wilmington earning wages below Washington levels may nonetheless have an equal or greater purchasing power than his Washington counterpart because of the higher cost of living there. Thus, an interpretation of "locality" as used in the Act as the place of performing the service is consistent with the policy of 41 U.S.C. § 253(a) because contractors located in a low cost of living area are not forced to include in their bid calculations the prevailing wages in a higher cost of living area. At the same time the policy of the Act is not frustrated by this interpretation because requiring contractors to pay their employees at wages prevailing in their own localities will be sufficient to enjoy a standard of living comparable to similarly employed workers elsewhere.

This Court finds the preceding analysis cogent and in accordance with Congressional intent. If Congress intended nationwide wage rates to be applied in procurements under the Service Contract Act, then there is a conspicuous dearth of language to that effect. Congress required wage levels based on the prevailing wage rates in the locality and further required the Secretary, in determining "locality" to take a "realistic view of the type of contract intended to be covered by the determination." [8] When the contract is of the type where the area of performance cannot be determined prior to the bid solicitation, a realistic view dictates that each bidder should base his bid on the prevailing wage rate, as determined by D.O.L., in his own specific locality. The nationwide interpretation of the Secretary is contrary to legislative intent, ordinary usage, past agency practice as well as common sense.

G. Pursuant to plaintiff's requested relief under Rule 57 of the Federal Rules of Civil Procedure and under 28 U.S.C. § 2201, this Court finds that the defendant's representatives in the Department of Labor act-

ed within their statutory authority in applying the Service Contract Act to the Defense Logistics Agency's Solicitation No. DLA13H–78–R–8947. However, the decision of the Division of Service Wage Determination that "locality", within the meaning of the Service Contract Act, meant the entire continental United States was not in accordance with law.

NOW THEREFORE, in accordance with the foregoing the defendant through its designated representatives, the Defense Personnel Support Center, the Defense Logistics Agency and the Department of Labor, is hereby ordered to apply the provisions of the Service Contract Act, 41 U.S.C. § 351 et seq. to the procurement of M.C.I. field rations pursuant to Solicitation No. SLA13H–78–R–8947;

■ IT IS FURTHER ORDERED that in all bid solicitations for M.C.I. field rations that the word "locality" within the Service Contract Act, 41 U.S.C. § 351 et seq. shall refer to the standard metropolitan statistical area, if available, or the specific county, where the bidding party's plant or facility is located.

AND IT IS SO ORDERED.

**8.** Senate Report No. 798, 2 U.S.Code Cong. & Admin.News 1965, at 3737, 3738.