**FEDERAL ELECTRIC CORPORATION,
Plaintiff,**

v.

**John T. DUNLOP, Secretary of Labor,
et al., Defendants.**

Civ. A. No. 74–320–Orl–Civ–Y.

United States District Court,
M. D. Florida,
Orlando Division.

March 30, 1976.

Spencer, Fane, Britt & Browne, by Stanley E. Craven, Kansas City, Mo., and Crofton, Holland, Starling, Harris & Severs, P. A., by Charles M. Harris, Titusville, Fla., for plaintiff.

John L. Briggs, U. S. Atty., Jacksonville, Fla., by William F. Duane, Asst. U. S. Atty., Orlando, Fla., and Jack A. Diamond, Washington, D. C., and Anthony B. Cuviello, Atlanta, Ga., for U. S. Dept. of Labor.

## MEMORANDUM OPINION

GEORGE C. YOUNG, Chief Judge.

The plaintiff in this action, Federal Electric Corporation (FEC) brought this suit for declaratory judgment under 28 U.S.C. § 2201 to obtain review of certain final actions taken by defendants as representatives of the Department of Labor pursuant to the Service Contract Act, 41 U.S.C. § 351 et seq. (hereinafter the "Act"). Jurisdiction of this action is vested in this Court under §§ 702, 704 of Title 5, United States Code.

At the trial, the Court granted defendants' motion to dismiss for lack of case or controversy as to two of the issues involved (Order of August 28, 1975). As a result, a single issue remained for this Court's decision. The parties agreed that that issue could be decided on the basis of stipulations and memoranda, and they have submitted these for the Court's consideration. These factual stipulations are hereby incorporated by reference and are attached as Appendix "A".

The sole remaining issue is whether employees of FEC who fit within ten specific job classifications are "service employees" as defined in the Act. The job classifications involved are all related to computer operations: (1) keypunch operator; (2) senior keypunch operator; (3) technical clerk; (4) senior technical clerk; (5) control specialist; (6) production specialist; (7) auxiliary equipment operator; (8) junior computer operator; (9) intermediate computer operator; and (10) senior computer operator.

The parties have also stipulated that each of the above ten classifications would be classified as a "general schedule" occupation in the federal civil service and would be covered under the Classification Act, as amended, 5 U.S.C. § 5101 et seq. None of these classifications would be covered as a "blue collar" or "wage board" occupation in the federal service. Further stipulations detail the exact white collar "GS" classifications of the jobs, the duties and requisite knowledge and abilities involved in each.

■ I. SCOPE OF REVIEW: The issues here presented is whether the Secretary of Labor correctly determined that the job classifications which are the subject of this suit come within the purview of the Service Contract Act. The determination of the Secretary as to the applicability of the Act to specific classifications must be upheld by this Court "if it has 'warrant in the record' and a reasonable basis in law." NLRB v. Hearst Publications, Inc., 322 U.S. 111, 131, 64 S.Ct. 851, 861, 88 L.Ed. 1170, 1185 (1944).

II. APPLICABILITY OF THE ACT: The Act applies to "every contract . . . entered into by the United States . . . in excess of $2,500, except as provided in section 356 of this title . . . ., the principal purpose of which is to furnish services in the United States through the use of service employees, as defined herein . . . ." 41 U.S.C. § 351(a).

A "service employee" is specifically defined in § 357(b) to mean:

" . . . guards, watchmen, and any person engaged in a recognized trade or craft, or other skilled mechanical craft, or in unskilled, semiskilled, or skilled manual labor occupation; and any other employee including a foreman or supervisor in a position having trade, craft, or laboring experience as the paramount requirement; and shall include all such persons regardless of any contractual relationship that may be alleged to exist between a contractor or subcontractor and such persons."

The essence of plaintiff's contentions is that the Act was never intended to cover persons providing services who fell within the traditional "white collar" classifications as set forth in the Classification Act, 5 U.S.C. § 5101 et seq. Plaintiff contends that the intent of the Act was to include only "blue collar" or "wage board" employees (with the exception of "guards" and

"watchmen", which were not excluded from the coverage of the Classification Act, but which were specifically included in the coverage of the Service Contract Act, § 357(b)). As indicative of the Congressional intent, plaintiff points to (1) the marked similarities between the *exclusions* from the Classification Act in 5 U.S.C. § 5102(c)(7) and the *inclusions* in the Service Contract Act, 41 U.S.C. § 357(b); (2) the Department of Labor's own statement, contained in 29 C.F.R. § 4.113(b), regarding the extent of the Service Contract Act's coverage; * (3) the Report on the Service Contract Act issued by the House Education and Labor Committee on September 1, 1965 (H.Rep.No.948) and adopted by the Senate's Labor and Public Welfare Committee on September 30, 1965 (S.Rep.No.798), U.S.Code Cong. & Admin. News 1965, p. 3737; ** and (4) statements of then Solicitor of Labor Donahue before the Special Subcommittee on Labor of the House of Representatives on August 5, 1965.*** Plaintiff relies additionally on *Descomp v. Sampson,* 377 F.Supp. 254 (D.C. Del.1974), which is the only case known to this Court to have considered the same issue and which case fully supports plaintiff's contentions.

Defendants, on the other hand, contend that the statutory definition of "service employee" given in 41 U.S.C. § 357(b), when the words of the statute are given their "ordinary" meaning, would include the job classifications here in issue. Defendants further rely on what they perceive to be the all-inclusive character of § 357(b)'s language:

> " . . . *any* person engaged in a recognized trade or craft, or other skilled mechanical craft, or in unskilled, semiskilled, or skilled manual labor occupations; and any other employee including a foreman or supervisor in a position having trade, craft, or laboring experience as the paramount requirement; and shall include *all* such persons regardless of any contractual relationship that may be alleged to exist between a contractor or subcontractor and such persons." (emphasis supplied).

Defendants urge that the only exceptions to the Act are found in § 356 or as are authorized under the power given to the Secretary under § 353(b) to approve certain variances not in issue here.

With regard to plaintiff's assertion that the Act was meant to cover only "blue collar" service employees (and "guards" and "watchmen" as specifically provided in § 357(b)), defendants contend that the "blue collar"—"white collar" distinction is neither an accurate nor complete expression of Congressional intent; and that while their own statement in 29 C.F.R. § 4.113(b) does speak of the scope of coverage in "blue collar" terms, that statement cannot fairly be read to limit the Act's coverage to traditionally "blue collar" job categories. Defendants point to other regulations which would arguably suggest that "white collar" workers would in fact be included under the Act. Defendants interpret the Congressional intent to be that of providing labor standards protection for *all* service contracts except those which had already received the attention of Congress (e. g., by the Walsh-Healy or Davis-Bacon Acts).

Finally, defendants contend that *Descomp v. Sampson, supra,* was wrongly decided.

■■ While this court must accord due deference to the expertise of the Secretary of Labor, this Court is also under a higher duty to ascertain and declare the law as Congress intended it. This duty includes holding, when necessary, that the Secretary's determination has exceeded the boundaries set by Congress. An analysis of the statute and consideration of the legislative history and the arguments of the parties has led this Court to conclude that the Secretary has, with respect to the job classifications here involved, exceeded those statutory boundaries.

* See Appendix "B"

** See Appendix "C"

*** See Appendix "D"

Section 351 of Title 41 applies to every contract entered into by the United States or the District of Columbia in excess of $2,500, subject to the exemptions provided in § 356, "the principal purpose of which is to furnish services in the United States . . . ." If Congress had stopped here, the Secretary would be correct in his expansive reading of the statute. But Congress further provided that the services contracted for be "through the use of service employees, *as defined herein,* . . . ." (emphasis supplied). This is a clear definitional limitation on the coverage of the Act, a restriction which would be independent of the exemptions for certain types of contracts and work contained in § 356.

■ Neither can § 357(b) be read as widely as the Secretary contends. The "any . . . all" language of that subsection must be read in the context in which those words appear. "Any" and "all" simply operate to include within the term "service employee" the totality of those persons who fit within the job categories set out in the remainder of § 357(b). The words have no talismanic or independent effect and they are not indicative, one way or the other, of the legislative intent as to the scope of the term "service employee." *Descomp v. Sampson,* supra, at 261–262.

■ It is presumed that when Congress drafts a statute, it does so with full knowledge of the existing law and with great care for the precise language which must be used to achieve the desired result. The terms employed in the Service Contract Act and its legislative history are in accord in indicating that Congress not only was fully cognizant of the Classification Act, but used that Act as a reference point in drafting the Service Contract Act's definition of "service employee." While it is true that the employment of terms in a statute which were taken from a preexisting statute dealing with a different subject matter should not rob the new statute of its independent vitality, the deliberate repetition of terms cannot be ignored in judging the substantive content of the new statute. Cf. *Northcross v. Board of Education,* 412 U.S. 427,

93 S.Ct. 2201, 37 L.Ed.2d 48 (1973). This is especially so in this case.

Section 357(b) is an almost verbatim repetition of the language used in 5 U.S.C. § 5102(c)(7) to exclude certain classes of workers from the Classification Act. The only differences are the inclusion of "guards" and "watchmen" in § 357(b) and the dropping of the language in 5 U.S.C. § 5102(c)(7) pertaining to employees in the Bureau of Engraving and Printing. This latter omission from the language adopted into § 357(b) from the Classification Act is quite obviously explained by the fact that employees of the Bureau of Engraving and Printing would never be involved in a contract covered under the Service Contract Act.

The choice of the "blue collar" definition contained in 5 U.S.C. § 5102(c)(7) as the operative language for § 357(b) was made with full recognition of its substantive trappings. Senate Report No. 798 of September 30, 1965, which incorporated House Report No. 948, cited the need for the Act. The concern of both the Senate and the House was with the low wage level frequently associated with certain employees, generally those whose "work is manual work and in addition to craftwork, may be semiskilled or unskilled. Types of service contracts which the bill covers are varied, and include laundry and drycleaning, custodial and janitorial guard service, packing and crating, food service, and miscellaneous housekeeping services." The Senate and House Reports further speak of these disadvantaged workers as the counterpart of "blue collar workers" in the Federal service. The Reports nowhere evidence a concern for those employees who would fall within the "white collar" classification.

■ That the Congress intended to incorporate the "blue collar" interpretive criterion from 5 U.S.C. § 5102(c)(7) along with the bare language used in § 357(b) is further evidenced by § 351(a)(5), wherein a service contract is required to contain a "statement of the rates that would be paid by the Federal agency to the various classes of service employees if section 5341 of Title 5

were applicable to them." The subsection further requires that "[t]he Secretary shall give due consideration to such rates in making the wage and fringe benefit determinations specified in this section." The Court notes that 5 U.S.C. § 5341 deals with "the pay of employees excepted from chapter 51 of this title by section 5102(c)(7)" ("blue collar" employees), and provides that the pay rates may not be less than specified in the Fair Labor Standards Act. This close intertwining of 5 U.S.C. § 5102(c)(7) with the Service Contract Act in language and derivation, and the interpretation given the bill by the Congress itself are strong evidence that the Act should cover no greater a field than the traditional "blue collar" definition.

▪ Defendants would urge this Court to place reliance on the 1975 report adopted by House Subcommittee on Labor-Management Relations entitled, "Congressional Oversight Hearings: The Plight of the Service Workers Revisited." (Pretrial brief of defendants, Pages 24–26.) Although that report does contain a specific disapproval of the *Descomp* decision and does say that the legislative intent was to give an "expansive scope" to the Act's coverage, the Court cannot consider that report as indicative of Congressional intent at the time of the Act's passage. Only contemporary legislative history should be considered in construing the Act. *Blanchette v. Connecticut General Insurance Corp.*, 419 U.S. 102, 132, 95 S.Ct. 335, 42 L.Ed.2d 320, 346 (1974). Congressional dissatisfaction with a Court's construction of an act must be expressed through subsequent legislation in order to change the law as indicated by the statute enacted and its contemporaneous legislative history.

▪ Furthermore, it is apparent that the Secretary of Labor initially considered coverage of "blue collar" workers to be the extent of his domain under the Act. As correctly pointed out in *Descomp, supra*, at 263–264, the Secretary's own statement in 29 C.F.R. § 4.113(b) militates against any wider interpretation of the Act, and by itself deprives the Secretary's subsequent

determination of the rational basis necessary to uphold it.

Thus it is the opinion of the Court that the use by Congress of language in 41 U.S.C. § 357(b) identical to the "blue collar" exclusion contained in 5 U.S.C. § 5102(c)(7) was fully intended to incorporate the "blue collar" classification as the operative criterion for consideration as a "service employee." *Descomp v. Sampson, supra.* Moreover, the Secretary of Labor cannot rationally contend otherwise, given the Department's statement in 29 C.F.R. § 4.113(b).

Judgment will be entered for the plaintiff.

## APPENDIX A

### SUPPLEMENTAL STIPULATION OF FACTS

Comes now plaintiff and defendants by their undersigned counsel and, in addition to stipulations numbered 1 through 23 heretofore entered into in the pretrial stipulation, make the following stipulations of fact for purposes of this proceeding.

24. Each of the ten job classifications herein involved would be classified as a "general schedule" occupation in the federal service and would be covered under the Classification Act of 1949, as amended, 5 U.S.C. Section 5101 *et seq.* None of the classifications would be covered as a "wage board" occupation in the federal service. (The Handbook of Blue Collar Occupational Families and Series is Plaintiff's Exhibit 1.)

25. The Junior, Intermediate and Senior Computer classifications would be included in the GS–332 series in the Handbook of Occupational Groups and Series of Classes established pursuant to the Classification Act of 1949, as amended, 5 U.S.C. Section 5101 *et seq.* The Keypunch and Senior Keypunch classifications would be included in the GS–356 series. The Auxiliary Equipment Operator would be included in the GS–333 series. The Control Specialist and Production Specialist classifications would be included in the GS–334 series. The Technical Clerk and Senior Technical Clerk would be included in the GS–301 series.

(For a description of all series established pursuant to the Classification Act, see Handbook of Occupational Groups and Series of Classes, which is Plaintiff's Exhibit 2). Defendants believe that the facts stipulated in paragraphs 24 and 25 are immaterial and irrelevant to a resolution of the issues herein.

26. Keypunch operators and Senior Keypunch operators perform substantially the same job duties and functions. The distinction between the two classifications is based on differences in service time and experience. The primary function of Keypunch operators is to transmit data from pre-prepared and formatted documents to keypunch tabulating cards, by the operation of keypunch machines. Operation of such machines involves reading the source documents and typing the data onto the cards by manually depressing (typing) numerical, alphabetical, and symbol keys, through established procedure and/or furnished instruction. A high level of manual dexterity and development of mechanical skills is required in the operation of such semicomplex keypunch machines. Verification of the punched cards is performed by another Keypunch operator who repunches the source data in an identical manner to assure accuracy. Incidental duties include maintaining logs and work records, and accomplishing card corrections. No supervision over other personnel is involved. These jobs normally require two or more years of prior experience or equivalent technical training in operation of keypunch machines.

27. Technical Clerks and Senior Technical Clerks perform substantially the same job duties and functions. The distinction between the two classifications is based on differences in service time and experience. Technical Clerks routinely perform the following functions: receive card decks and identification work sheets from programmers and, when required, pull and attach to the job order related magnetic tapes from library storage and deliver same to appropriate computer operator; receive and store magnetic tapes in the library and retrieve,

issue, and possibly display data items therein; prepare and maintain control records, inventory lists, and reports of tape and data received, stored, and distributed by the library; receive and handle inquiries and requests of the library customers. Performance of these functions involves, among other things, regular lifting, handling, and transportation of all tape reels, boxes, and card decks, received, issued, and stored in the library. All functions are performed according to instruction and established procedure, with the exercise of independent job decisions being minimal. The job involves no supervision over other personnel. Some knowledge of computer and auxiliary equipment and terminology is generally required.

28. The principal functions of the Auxiliary Equipment Operator classification include the operation of a variety of machines such as card sorters, interpreters, collators, decollators, reproducers, printers, and magnetic tape units. The operation of such equipment requires among other things the following manual functions: hanging tape reels, loading paper, loading cards in feeds and removing them from hoppers, changing plug boards, changing ribbons, cleaning tape drives, setting dials, pushing buttons, operating switches, and cleaning and maintaining the equipment. Other duties include courier service, replenishment of supply and keeping the work area clean and neat. Performance of all functions and duties are pursuant to established routine procedures and detailed instruction with only minimal independent decision-making authority. No supervision of other personnel is involved. Generally some prior training or experience in computer fundamentals is required.

29. Under direct supervision of higher level operators, Junior Computer Operators operate equipment such as printers, and magnetic tape units (e. g., Univac Electronic Accounting Machine and Honeywell 4460). Operation of these machines involves among other things the following manual and mechanical functions: loading and unloading film, cards, paper, card

decks, tape drives and tape reels; changing ribbons; removing printouts; changing plug boards; manipulating a variety of buttons, switches, and knobs; cleaning tape drives and other equipment maintenance; and replenishing supply. All functions are pursuant to detailed instruction or established procedures with only a minimal independent decision-making authority. The job involves no supervision of other personnel. Formal training in computer fundamentals is generally required.

30. Under general direction of the Senior Computer Operators or unit leaders, Intermediate Computer Operators run computer programs through the operation of computer consoles. Operation of the console involves the manipulation and monitoring of a variety of informational display buttons such as request buttons, end of message buttons, operator error buttons; typing in messages on input keyboard; loading paper into console; and monitoring such devices as master mode and slave mode buttons. Job functions also include the operation of peripheral equipment such as printers, the loading and unloading of magnetic tapes, card decks, and disc units, and associated clerical duties required in computer operations during peak work periods or loads. Although Intermediate Operators follow routine procedures in responding to system messages a majority of the time, such employees occasionally exercise independence in coordination with Senior Operators in analyzing job problems or system loading to increase system utilization. Intermediate Operators provide minimum supervision over other operators as in giving mounting/loading instructions with respect to peripheral equipment. This position requires formal training in computer fundamentals. Employees must have demonstrated competency in the operation and loading of peripheral equipment and possess a working knowledge of the operating software and system hardware.

31. Under very general direction of the leader, Senior Computer Operators perform the following job duties and functions: determine equipment set-up; load and operate card readers and paper tape punch/readers; mount and dismount paper tape and disc packs; regularly perform all functions of Intermediate Computer Operators; perform numerous associated clerical duties with respect to job control and quality assurance; train lesser-graded operators; continuously monitor and observe the total system activities and equipment to pinpoint any problems or equipment failure and make equipment switches and adjustments; review program errors of operation, determine causes and refer problems to supervisor and/or programmers; may test and assist in program corrections; provide technical direction and coordinate functions of operators. In carrying out such duties employees in this classification follow broad general procedures but must make independent decisions regarding the running or re-running of jobs, termination of jobs not executing properly and the status or current loading of the system. In addition to formal training in computer fundamentals, Senior Computer Operators must have a background of progressive responsibility in the operations of the computer systems and possess broad indepth knowledge of such systems, including operating software and system hardware.

32. Employees in the two classifications of Production Specialist and Control Specialist perform substantially the same job duties and functions with certain exceptions noted herein. The distinction between the two classifications is based on such exceptions as well as differences in service time and experience. The primary functions of these jobs are: scheduling and laying out daily production work load; maintenance of records and files with respect to the status of set-up work, work in progress, and quality assurance; performance of various monitoring and checking procedures to assist in expediting and assuring acceptable work production as well as problem investigation and solving through, among other things, the accomplishment of override cards by operation of keypunch machines, visual inspection of decollated printed data, and the viewing of data on microfilm by operation

of microfilm viewers. Operation of these viewers requires manipulation of various buttons and adjustment devices as well as the mounting and dismounting of film reels. A further function is the issuing of data. In this function employees regularly perform manual tasks such as the boxing of printed data which they have inspected and the lifting, handling, and storing of boxed data items and magnetic tape reels.

In addition to these common job functions, Production Specialists also review documentation of new jobs to determine the feasibility of setting such programs up in a manner different than that determined by the programmer for more efficient utiliza-tion of materials and machine time. Production Specialists also supervise lower clas-sified personnel and occasionally act as shift supervisor in the operation of the unit while control specialists have no supervision over other personnel. Both classifications require extensive experience and knowledge of overall data processing systems, and computer and peripheral equipment hardware and software in order to expeditiously determine data requirements and analyze problems within the system. Control Specialists generally follow established methods of operation to a greater degree than Production Specialists who, with greater frequency, initiate independent technical job decisions in analyzing problems during corrective action procedures.

## APPENDIX B
## 29 C.F.R. § 4.113

§ 4.113 **Contracts to furnish services "through the use of service employees".**

(a) *Use of "service employees" in contract performance.* (1) As indicated in § 4.110, the Act covers service contracts in which "service employees" will be used in performing the services which it is the purpose of the contract to procure. A service contract otherwise subject to the Act ordinarily will meet this condition if any of the services which it is the principal purpose of the contract to obtain will be furnished through the use of any service employee or employees. Even where it is contemplated that the services (of the kind performed by service employees) will be performed individually by the contractor himself, the contract cannot be considered outside the reach of the Act unless it is known in advance that the contractor will in no event use any service employee during the term of the contract in furnishing the services called for. If the contracting officer knows when advertising for bids or concluding negotiations that no such employee will be used by the contractor in any event in providing the contract services, the Act will not be deemed applicable to the contract and the contract clauses required by § 4.6 or § 4.7 may be omitted. However, in all other cases such clauses must be included in the contract documents, for application in the event service employees are used in furnishing the services. The fact that the required services will be performed by municipal employees or employees of a State would not remove the contract from the purview of the Act, as this Act does not contain any exemption for contracts per-formed by such employees. Also, where the services the Government wants under the contract are principally of a type that will require the use of service employees as defined in section 8(b) of the Act, including supervisory personnel in positions "having trade, craft, or laboring experience as the paramount requirement", the contract is not taken out of the purview of the Act by the fact that the manner in which the services of such employees are performed will be subject to the continuing overall supervision of professional personnel to whose services the Act would not be considered to apply.

(2) The coverage of the Act does not extend, however, to contracts which have as their principal purpose the procurement of a type of service in the furnishing of which no service employees will be used. A contract for medical services is an example of such a contract. So are other contracts under which the desired services called for by the Government are to be performed by bona fide executive, administrative, or professional personnel as defined in Part 541 of this title (see paragraph (b) of this section). Also, any contract for professional services which is performed essentially by professional employees, with the use of service employees being only a minor factor in the performance of the contract, is not covered by the Act. While the incidental employment of service employees will not render a contract for professional services subject to the Act, a contract which requires the use of service employees to a substantial extent would be covered even though there is some use of professional employees in performance of the contract.

(b) *"Service employees" defined.* In determining whether or not any of the contract services will be performed by service employees, the definition of "service employee" in section 8(b) of the Act is controlling. It provides:

> The term "service employee" means guards, watchmen, and any person engaged in a recognized trade or craft, or other skilled mechanical craft, or in unskilled, semiskilled, or skilled manual labor occupations; and any other employee including a foreman or supervisor in a position having trade, craft, or laboring experience as the paramount requirement; and shall include all such persons regardless of any contractual relationship that may be alleged to exist between a contractor or subcontractor and such persons.

It will be noted that the definition expressly includes certain supervisory employees. However, it is not deemed to include those employees who are employed in a bona fide executive, administrative, or professional capacity as defined in Part 541 of this title. The breadth of the definition is indicated by the fact that much of its language is identical with that in the Classification Act Amendments of 1954 (5 U.S.C. 1082(7)) defining the so-called "blue collar workers" or "wage board employees" in the Federal service. The legislative history indicates that such employees are the "counterpart" in Federal service of the contractors' employees to whom the Act was intended to extend. (H. Rept. No. 948, 89th Cong. 1st sess. p. 2.) The definition therefore includes as service employees those classes of employees described in some detail in the Handbook of Blue Collar Occupational Families and Series issued by the Civil Service Commission (the latest being October 1961). Some of the specific types of service employees who may be employed on service contracts are noted in subsequent sections which discuss the application of the Act to employees.

## APPENDIX C
### 1965 U.S. CODE CONGRESSIONAL AND ADMINISTRATIVE NEWS, 89TH CONGRESS, FIRST SESSION, PAGES 3737–3741.

## SERVICE CONTRACT ACT OF 1965

*For text of Act see p. 1029*

House Report (Education and Labor Committee) No. 948,
Sept. 1, 1965 [To accompany H.R. 10238]

Senate Report (Labor and Public Welfare Committee) No. 798,
Sept. 30, 1965 [To accompany H.R. 10238]

Cong. Record Vol. 111 (1965)

### DATES OF CONSIDERATION AND PASSAGE

House Sept. 20, Oct. 6, 1965

Senate Oct. 1, 1965

The Senate Report is set out.

### SENATE REPORT NO. 798

THE Committee on Labor and Public Welfare, to which was referred the bill (H.R. 10238) to provide labor standards for certain persons employed by Federal contractors to furnish services to Federal agencies, and for other purposes, having considered the same, reports favorably thereon with an amendments and recommends that the bill (as amended) do pass.

### EXPLANATION OF AMENDMENT

The amendment enlarges the definition of the term "United States" to extend coverage of the bill to the Eniwetok and Kwajalein Atolls and Johnston Island.

## PURPOSE OF THE BILL

The purpose of this bill is to provide labor standards for the protection of employees of contractors and subcontractors furnishing services to or performing maintenance service for Federal agencies. The service contract is the only remaining category of Federal contracts to which no labor standards protection applies. Federal construction contracts require compliance with labor standards under the Davis-Bacon Act and related statutes. Federal supply contracts also provide labor standards under the Walsh-Healey Public Contracts Act.

The bill is applicable to advertised or negotiated contracts in excess of $2,500, the principal purpose of which is to furnish services through the use of service employees. Service employees are defined in the bill as guards, watchmen, and any person in a recognized trade or craft, or other skilled mechanical craft, or in unskilled, semiskilled, or skilled manual labor occupations. Typical services furnished would also include laundry and dry-cleaning, custodial, janitorial, cafeteria, food, and miscellaneous housekeeping.

Persons covered by the bill must be paid no less than the prevailing rate in the locality as determined by the Secretary, including fringe benefits as an element of the wages. No less than the applicable minimum wage provided in the Fair Labor Standards Act, as amended, can be paid. In determining the prevailing rate in the locality, the Secretary will consider the compensation paid persons engaged in such service-type work and work of a similar type in the locality. The Secretary in determining the locality for such purpose would take a realistic view of the type of service contract intended to be covered by the determination.

In addition, the bill requires that work shall not be performed under unsafe or unsanitary working conditions.

Enforcement procedures are provided in the bill including the withholding of payments due the contractor under the contract and payments to the employees of amounts due them; suit by the United States against the contractor or surety to recover the amount of underpayment; cancellation of the contract for any violation with the contractor liable for any resulting cost to the United States; authority for the Secretary to list and withhold awarding further contracts to contractors violating this bill for up to 3 years; and authority to issue regulation under sections 4 and 5 of the Walsh-Healey Public Contracts Act to enforce this bill. The authority to list contractors violating this act specified in the bill and to recommend no further contracts of the United States be awarded such violators is subject to the provision of sections 4 and 5 of the Walsh-Healey Public Contracts Act. Contractors would therefore be entitled to the notice, hearing, and other procedures provided for in said act.

There are certain specific exemptions from coverage listed in section 7 including contracts covered by the Davis-Bacon Act, the Walsh-Healey Public Contracts Act, the Interstate Commerce Commission, the Communication Acts of 1934; also, contracts for public utility services, direct employment by individuals, and for postal contract stations.

During the testimony of Charles Donahue, Solicitor of Labor, it was brought to the attention of the committee that certain service employees of the Department of Defense who are paid from nonappropriated funds are

not covered by this bill. Mr. Donahue, in a memorandum submitted to the committee, said:

> The authority of that Department would undoubtedly also support directives requiring a minimum wage for all nonappropriated fund activity employees. Similarly, it would appear to be within existing authority to require prevailing wage rates to be paid these employees as is required for blue-collar workers of the Federal Government.
>
> The principal types of employees who would be affected are believed to be those employees for PX's, ship's stores, officers clubs and in recreational activities for the benefit of the Armed Forces.

The committee strongly urges that appropriate directive issue by the Department of Defense or any other appropriate Federal agency to give to such service employees the coverage provided by this bill.

## BACKGROUND OF THE BILL

A number of bills having the same general purpose of this bill have been introduced in the past. Hearings were held by the House Select Subcommittee on Labor in the 88th Congress. The record included pleas for this type legislation from labor organizations and from service contractors. Testimony was heard from Federal agencies and reports were received from the Bureau of the Budget, General Services Administration, etc. A bill was reported (H.Rept. No. 1495, 88th Cong.).

This year, Congressman James G. O'Hara (author of the 88th Cong. legislation) introduced H.R. 10238 which was sponsored by the administration. Hearings were held on August 5 and September 1. H.R. 10238 was unanimously reported from the House Education and Labor Committee. It passed the House on the call of the Consent Calendar on September 20, 1965, with the apparent unanimous support of the House Members.

Hearings were held by the Senate Subcommittee on Labor on September 23 and the bill was reported unanimously to the full Committee on Labor and Public Welfare the same day.

## NEED FOR THE LEGISLATION

The need for this legislation is well stated in the report issued by the House Education and Labor Committee on September 1, 1965 (H.Rept.No. 948), as follows:

> Many of the employees performing work on Federal service contracts are poorly paid. The work is generally manual work and in addition to craftwork, may be semiskilled or unskilled. Types of service contracts which the bill covers are varied and include laundry and drycleaning, custodial and janitorial, guard service, packing and crating, food service, and miscellaneous housekeeping services.
>
> Service employees in many instances are not covered by the Fair Labor Standards Act or State minimum wage laws. The counterpart of these employees in Federal service, blue-collar workers, are by a Presidential directive assured of at least the Fair Labor Standards Act minimum. Bureau of Labor Statistics surveys of average earnings in service occupations in selected areas in 1961 and 1962 show, however, that an extremely depressed wage level may prevail

in private service employment. In contract cleaning services, for example, in some areas less than $1.05 an hour was paid. Elevator operators earned low rates, varying from $0.79 to $1.17 an hour. Service contract employees are often not members of unions. They are one of the most disadvantaged groups of our workers and little hope exists for an improvement of their position without some positive action to raise their wage levels.

The Federal Government has added responsibility in this area because of the legal requirement that contracts be awarded to the lowest responsible bidder. Since labor costs are the predominant factor in most service contracts, the odds on making a successful low bid for a contract are heavily stacked in favor of the contractor paying the lowest wage. Contractors who wish to maintain an enlightened wage policy may find it almost impossible to compete for Government service contracts with those who pay wages to their employees at or below the subsistence level. When a Government contract is awarded to a service contractor with low wage standards, the Government is in effect subsidizing subminimum wages.

## SECTION-BY-SECTION ANALYSIS

**Section 1.** The act is cited as the "Service Contract Act of 1965."

**Section 2.** (a) Every Federal contract in excess of $2,500 (except as provided in sec. 7) the principal purpose of which is to furnish services in the United States through the use of service employees shall contain:

(1) A provision specifying the minimum wages to be paid service employees performing the contract as established by the Secretary in accordance with prevailing rates for such employees in the locality.

(2) A provision specifying the fringe benefits to be furnished such employees as determined by the Secretary as prevailing for such employees in the locality.

(3) A provision that no part of such contract will be performed in buildings or surroundings which are unsanitary or hazardous or dangerous to the health and safety of such employees.

(4) A provision that the contractor or subcontractor shall furnish employees covered by the act a notice of the compensation required under paragraphs 1 and 2 or that he shall post such notice at the worksite.

(b) (1) No contractor or subcontractor holding such a service contract shall pay any of his employees working under such contract less than the minimum wage specified by section 6(a) (1) of the Fair Labor Standards Act, as amended.

(2) The provision of sections 3, 4, and 5 of this act shall be applicable to violations of this subsection.

**Section 3.** (a) Any violation of section 2 renders the party responsible therefor, liable in the amount of such underpayment and the contracting agency may withhold payments to the contractor in a deposit fund as necessary to pay such employees. Such payments due employees are to be paid on order of the Secretary.

(b) The Federal agency head or the Secretary is authorized to carry out this section.

(c) Upon the finding of any contract violation, the contracting agency may cancel by written notice, whereupon the United States may enter into other contracts or arrangements for completion of the original contract, charging any additional cost to the original contractor.

**Section 4.** (a) Sections 4 and 5 of the Walsh-Healey Public Contracts Act, as amended, shall govern the Secretary's authority to enforce this act.

(b) The Secretary may provide such reasonable limitations and may make such rules and regulations allowing reasonable variations, tolerances, and exemptions to and from any or all provisions of this act as he may find necessary and proper in the public interest or to avoid serious impairment of the conduct of Government business.

**Section 5.** (a) The Comptroller General is directed to distribute a list to all agencies of the Government giving the names of persons or firms that the Federal agencies or the Secretary have found to have violated this act. Unless the Secretary otherwise recommends, no contract of the United States shall be awarded to the persons or firms appearing on this list or to any firm, corporation, partnership, or association in which such persons or firms have a substantial interest until 3 years have elapsed from the date of publication of the list containing the names of such persons or firms.

(b) If the accrued payments withheld under the terms of the contract are insufficent to reimburse all service employees with respect to whom there has been a failure to pay the compensation required pursuant to this act, the United States may bring action against the contractor, subcontractor, or any sureties in any court of competent jurisdiction to recover the remaining amount of underpayments. Any sums thus recovered by the United States shall be held in the deposit fund and shall be paid, on order of the Secretary, directly to the underpaid employee or employees. Any sum not paid to an employee because of inability to do so within 3 years shall be covered into the Treasury of the United States as miscellaneous receipts.

**Section 6.** In determining any overtime pay to which such service employees are entitled under any Federal law, the regular or basic hourly rate of pay of such an employee shall not include any fringe benefit payments computed hereunder which are excluded from the regular rate under the Fair Labor Standards Act by provisions of section 7(d) thereof.

**Section 7.** This Act shall not apply to—
(1) Contracts covered by Davis-Bacon Act.
(2) Contracts covered by Walsh-Healey Public Contracts Act.
(3) Contracts for the coverage of freight or personnel under tariff rates established by the Interstate Commerce Commission or comparable State and local bodies.
(4) Contracts subject to the Communications Act of 1934.
(5) Contracts for public utility service.
(6) Contracts providing for direct services to a Federal agency by an individual or individuals.
(7) Contracts for the operation of postal contract stations.

**Section 8.** (a) "Secretary" means Secretary of Labor.
(b) "Service employee" means guards, watchmen, and any person engaged in a recognized trade or craft, or other skilled mechanical craft, or

in unskilled, semiskilled, or skilled manual labor organizations, and any other employee in a position having trade, craft, or laboring experience as the paramount experience, all such persons are included regardless of any contractual relationship that may be alleged to exist between a contractor or subcontractor and such persons.

(c) "Compensation" means any of the payments or fringe benefits described in section 2.

(d) "United States" means any State of the United States, the District of Columbia, Puerto Rico, the Virgin Islands, the Outer Continental Shelf lands as defined in the Outer Continental Shelf Lands Act, American Samoa, Guam, Wake Island, Eniwetok Atoll, Kwajalein Atoll, and Johnston Island, but shall not include any other territory under the jurisdiction of the United States or any U. S. base or possession within a foreign country.

**Section 9.** This act shall apply to all contracts entered into pursuant to negotiations concluded or invitations for bids issued on or after 90 days from the date of enactment of this act.

---

### APPENDIX D

". . . The standards set forth in HR 10238 would apply to guards, watchmen, and employees of the type for which wage rates are set by individual agency wage boards when the workers are employed by the Government. The employees are, as you know, employees in trades, crafts, or manual labor occupations, including supervisors, often referred to as "blue collar" workers."

Statement of Solicitor of Labor Charles Donahue at a hearing before the Special Subcommittee on Labor of the Committee on Education and Labor, House of Representatives, 89th Congress, First Session on HR 10238, Page 4, *as quoted in Descomp vs. Sampson, supra,* at 262.