## SHELL OIL COMPANY
### v.
## FEDERAL ENERGY ADMINISTRA-TION et al.

### Civ. A. No. 75-H-33.

United States District Court,
S. D. Texas,
Houston Division.

Aug. 7, 1975.

William G. Williams, Jr., Shell Oil Co., Houston, Tex., William Simon, Howrey, Simon, Baker & Murchison, Washington, D. C., for plaintiff.

Willliam L. Bowers, Asst. U. S. Atty., Houston, Tex., for defendant.

### Memorandum Opinion

SINGLETON, District Judge.

The above-styled-and-numbered cause of action comes before the court on cross-motions for summary judgment. A hearing was held May 15, 1975, at which time arguments of counsel were heard. The court has made the following determination which will constitute findings of fact and conclusions of law. In answer to a specific question by the court at the hearing, both parties agreed that there are no material facts in issue.

Shell Oil Company (hereinafter referred to as "Shell") is engaged in the retail marketing of gasoline and related products. Shell sells gasoline to retail dealers under dealers sales agreements. As another part of its business, Shell leases or subleases service station properties to dealers under dealer leases.

Defendant Federal Energy Administration (hereinafter referred to as "FEA") is an agency of the United

States, organized and existing under the provisions of the Federal Energy Administration Act of 1974, Pub.L. 93–275, 88 Stat. 96, 15 U.S.C. § 761 *et seq.* (hereinafter referred to as the "FEA Act"), and Executive Order No.11790 June 25, 1974, 39 Fed.Reg. 23185), set forth at 15 U.S.C. § 761 note, both of which became effective on June 27, 1974. The FEA is the successor to the Federal Energy Office (hereinafter referred to as "FEO"), which was established by Executive Order No. 11748 on December 4, 1973 (38 Fed.Reg. 33575, December 6, 1973).

Shell's leases or subleases to dealers cover approximately 10,000 service stations. Dealers who lease, or sublease service station properties from Shell are not required to purchase gasoline from Shell. Shell gasoline is sold at 10,000 additional outlets which are neither owned by nor leased to nor subleased by Shell.

Some, but not all, of Shell's dealer leases provide for rent to be calculated on the basis of the volume of gasoline delivered to the service station. The collection of rent in terms of cents per gallon has been Shell's historical method of operation because it apparently facilitates rent collection at time of delivery. Other dealer leases, however, are expressed in a flat dollar monthly sum.

The leased premises include many areas not devoted to the sale of gasoline, such as service bays for repairs and automobile maintenance, storage areas, parking areas, office space, car wash areas and yards.

During the period from July 1, 1968, to July 1, 1971, when the prices and rentals were not controlled, the price which Shell charged its dealers for gasoline rose an average of 2 percent. The average rental which Shell charged to lessees of service station properties rose 44 percent. Real estate costs incurred by Shell during the same period rose 41 percent.

The Economic Stabilization Act of 1970, as amended, 12 U.S.C. § 1904 note (hereinafter referred to as the "Stabilization Act"), enacted August 15, 1970, authorized the President or his delegate to issue regulations to "stabilize prices, rents, wages, and salaries . . .."

On January 12, 1973, the President delegated his powers under the Stabilization Act to the chairman of the Cost of Living Council (hereinafter referred to as "CLC"), thereby authorizing him to "take the actions required or permitted by the act." § 2(a) Executive Order 11695 (38 F.R. 1473, January 12, 1973), which was continued in effect by Executive Order 11730 (38 F.R. 19345, July 19, 1973).

Regulations controlling rents charged in leasing service station properties were published by the CLC on August 17, 1973, pursuant to the stated authority of the Stabilization Act, and by the FEO on January 2, 1974, and January 15, 1974, pursuant to the stated authority of the Stabilization Act and the Allocation Act.

On November 27, 1973, the Allocation Act was enacted. Section 4(a) thereof, 15 U.S.C. § 753(a), empowered the President to specify prices for petroleum products. It provides:

Not later than fifteen days after November 27, 1973 the President shall promulgate a regulation providing for the mandatory allocation of crude oil, residual fuel oil, and each refined petroleum product, in amounts specified in (or determined in a manner prescribed by) and at prices specified in (or determined in a manner prescribed by) such regulation. Subject to subsection (f) of this section, such regulation shall take effect not later than fifteen days after its promulgation. Except as provided in subsection (e) of this section such regulation shall apply to all crude oil, residual fuel oil, and refined petroleum products produced in or imported into the United States.

On December 4, 1973, the President issued Executive Order 11748 (38 F.R. 33575, December 6, 1973), which established the FEO and named the then Deputy Secretary of the Treasury, William E. Simon, as its administrator.

Executive Order 11748 delegated to the FEO the President's authority under three acts of Congress: (1) Section 203 (a)(3) of the Economic Stabilization Act of 1970, insofar as it related to petroleum; (2) the Allocation Act, and (3) the Defense Production Act of 1950, insofar as it related to the production, conservation, use, control, distribution, and allocation of energy.

On December 5, 1973, the Internal Revenue Service, upon request, issued an interpretation that Shell's proposed dealer agreements contained prospective rental increase provisions which were forbidden by section 150.360(c) of the CLC's price regulations (38 F.R. 22542, August 22, 1973).

On December 11, 1973, FEO proposed price regulations which incorporated by reference the CLC's price rules concerning petroleum products, including the rental regulation contained in 150.360(c) (39 F.R. 34414, December 13, 1973).

On December 26, 1973, the CLC issued its order No. 47 which delegated its petroleum pricing authority to FEO (30 F.R. 24, January 2, 1974).

On January 14, 1974, the FEA issued Revised Petroleum and Allocation and Price Regulations which superseded and recodified the December 27, 1973, regulations (39 F.R. 1924, *et seq.*, January 15, 1974).

The regulations promulgated on January 14, 1974, covered the lease rental terms of retail gasoline stations, stating that the control over rental terms applied to each leased real property used in the retailing of gasoline. With respect to said property section 212.103(a) of the price regulations provided:

A lessor or lessee of real property used in retailing gasoline may not—

(a) increase, offer to increase, or give notice of intent to increase the rent for that real property to an amount in excess of the base rent as defined in § 212.102;

On April 30, 1974, the Stabilization Act and all stated authority of the FEO to control rentals contained therein expired. 12 U.S.C. § 1904 note § 218.

On April 30, 1974, the FEO amended its regulations effective May 1, 1974. The preamble to those regulations which appeared in the Federal Register of May 1, 1974, stated:

Part 212 of the Federal Energy Office regulations were promulgated, in part, pursuant to authority contained in the Economic Stabilization Act of 1970 and delegated to the FEO by the Chairman of the Cost of Living Council in CLC Order No. 47. On April 30, 1974, the Economic Stabilization Act of 1970 and all executive authority over rentals contained therein are scheduled to expire.

Subpart G of Part 212 of the Federal Energy Office regulations is amended to reflect the imminent change in FEO authority over rentals respecting real property used in the retailing of gasoline.

\* \* \* \* \* \*

The leasing of property used in the retailing of gasoline, between suppliers and retailers, is inextricably woven into the fabric of the supplier's marketing system and is directly related to the price at which gasoline is sold at retail. The price charged for product and the rent charged for the property, each of which is often expressed as a flat rate in cents per gallon, constitute a combined charge to the retailer by the suppliers for the purchasing and retailing of gasoline. FEO has determined that the

statuory mandate to regulate the price of refined petroleum products requires the continued regulation of rents charged between retailers and suppliers in service station leases, as an integral part of its petroleum pricing regulations.

The amended regulations provided as follows:

§ 212.101 Applicability.

This subpart applies to each leased real property used in the retailing of gasoline where both the lessor and lessee are refiners, resellers, reseller-retailers, or retailers, as defined in this part.

§ 212.102 Definitions.

"Base rent" with respect to a lease of real property used in the retailing of gasoline means the rent charged for that station pursuant to the contractual terms prevailing of May 15, 1973.

§ 212.103 Price rule.

A lessor or lessee of real property used in retailing gasoline may not—

(a) increase, offer to increase, or give notice of intent to increase the rent for that real property to an amount in excess of the base rent as defined in § 212.102.

On June 27, 1974, the FEA was created and assumed the duties of the FEO.

After the Stabilization Act expired, Shell requested a determination that the rent control regulations exceeded the statutory authority of the FEA under the Allocation Act.

In its decision and order dated December 10, 1974, in case FER–0005, the FEA determined that it has the authority to regulate the rental of real property used in the retailing of gasoline, notwithstanding the fact that the Stabilization Act expired on April 30, 1974. That decision and order stated:

Although the broad authority over rents which the FEA exercised during the life of its delegated powers from the Economic Stabilization Act expired with that Act, the FEA retained the authority to regulate rents where such rents are so inextricably intertwined with the rent for fuel areas and uses as to make their separation impracticable.

The regulations of the FEA do not permit Shell to increase its rentals to pass through increased costs incurred in leasing service stations. From May 15, 1973, to December 31, 1974, Shell's real estate costs incurred in connection with leased and subleased service stations have increased by an average of 14 percent with a total increase in costs attributable to service station properties leased by Shell being in the aggregate of $23,080,000. These costs continue to increase.

Shell has entered into three-year renewal leases for 4,485 service properties between May 15, 1973, and December 31, 1974. The projected cost increases which will be incurred by Shell attributable to those properties during the three-year term of such renewed leases is $22,200,000.

Many of the leases and subleases which Shell has with dealers provide for an initial rental higher than the May 15, 1973, rental and provide for annual rental increases. When the leases have been renewed, Shell has sent to its lessee dealers letters containing a disclaimer that the renewal lease "should not be taken as an increase, offer to increase or notice of intent to increase your current rental" and further stated that the "rental charged under the new lease will become effective only when permitted" by federal law.

Shell has approximately 3,000 leases accompanied by such a disclaimer letter now in effect.

The FEA's decision and order, dated December 10, 1974, in case FER–0005, states:

Shell's additional argument that its disclaimer of intent to increase or give notice of intent to increase the cur-

rent service station rent neutralized the prospective rent increases in its Dealer Leases is without merit.

Shell, since the FEA decision and order, dated December 10, 1974, in case FER–0005, has discontinued the practice of entering into three-year leases for service station properties and to renew service station leases for shorter terms, generally one year.

The FEA's authority under the Allocation Act ends on August 31, 1975.

The instant case seeks a judicial review of that decision and order, an injunction, and a declaratory judgment that the FEA has no authority under the Allocation Act to control the rentals which Shell charges for service station properties.

The FEA's decision and order, dated December 10, 1974, in the case FER–0005, stated that it was a "final order" of the FEA from which Shell could "seek judicial review." Despite that fact, the FEA has contended that Shell has failed to fully exhaust its administrative remedies.

At the outset, the court finds that Shell does not need to exhaust any further administrative remedies it may have in order to come into this court for a judicial review of the FEA's order.

■ Recently, the Temporary Emergency Court of Appeals held in *Consumers Union of United States, Inc. v. Cost of Living Council*, 491 F.2d 1396 (Em.App.1974), *cert. denied*, 416 U.S. 984, 94 S.Ct. 2387, 40 L.Ed.2d 761 (1974), that exhaustion of remedies is not required if the question involved is purely legal, requiring no administrative fact finding to properly frame the issues in dispute, or the Agency's expertise in determining technical factual disputes is not necessary because the question is purely legal, or the purported illegality of the regulations are known to the Agency and they have declined to remedy the alleged illegality. All three of these exceptions are present in the instant case. The court holds that in the circumstances of this case there is no further necessity for Shell to seek agency action before coming into this court of law.

The case comes before the court on a very narrow issue of law: does the FEA have the statutory authority to control the rents charged by Shell for its service station property? As Shell has pointed out, this question differs substantially from one of whether or not the regulation as promulgated is reasonable or rational.

No matter how reasonable and rational the regulation may be thought to be; no matter how praiseworthy the goal which is sought to be achieved, if the regulation goes beyond the statutory authority given by Congress to the FEA, the regulation is invalid.

Unlike the Economic Stabilization Act of 1970, the Allocation Act has not given FEA specific authority to control rents of service station properties. Only the authority to control gasoline prices has been given. Section 203(a) of the now expired Stabilization Act gave the President the authority specifically to stabilize prices, wages, rents, salaries, interest rates, and corporate dividends. 15 U.S.C. § 753(a). The Allocation Act, 12 U.S.C. § 1904 note § 218 gave the president the authority to specify the prices for gasoline. Congress also omitted salaries, interest rates, and wages from the Allocation Act. The court does not believe that the congressional omission of a provision for rent in the Allocation Act was inadvertent.

■ Clearly, Congress found a difference between prices and rents in the Stabilization Act. The plain meaning of these terms, too, precludes the latter from being embraced within the former. An intentional omission of a word is evidence that Congress did not intend to grant a power which the inclusion of the word would have given. *State Highway Commission of Missouri v. Volpe*, 479 F.2d 1099, 1114 (8th Cir. 1973); *Alcoa Steamship Company, Inc. v. Federal Maritime Commission*, 121

U.S.App.D.C. 144, 348 F.2d 756, 758 (1965). *J. McDermott & Co. v. Vessel Morning Star,* 457 F.2d 815, 818 (5th Cir.) *(en banc), cert. denied,* 409 U.S. 948, 93 S.Ct. 292, 34 L.Ed.2d 218 (1972).

The legislative history of the Allocation Act, too, strongly indicates that the draftsmen did not intend to authorize anything more than price controls as an incidental method to effectuate the broad allocation authority:

> The conference committee wishes to make several comments with respect to the pricing authority contained in this legislation. This has been included on the premise that it does no good to require the allocation of products if sellers are then permitted to demand unfair and unrealistic prices. It is not intended, however, that the pricing authority be exercised by establishing specific prices for products at each level in the distribution system. For example, the regulation could merely state an equitable method for determining price levels, such as permitting a specified percentage markup of base cost. The conference committee has decided to couple price controls with the mandatory allocation authority so as to focus in a single act decision-making authority and responsibility for dealing with the fuels shortage situation.
>
> \*    \*    \*    \*    \*    \*
>
> The reference to equitable prices in the bill is specifically intended to emphasize that one of the objectives of the mandatory allocation program is to prevent price gouging or price discrimination which might otherwise occur on the basis of current shortages. On the other hand, it is contemplated that prices for allocated fuels will be set at levels or pursuant to methods which will permit adequate compensation to assure that private property is not implicitly confiscated by the government.

H.R.Rep.No.93–628, 93d Cong., 1st Sess. 25–26, U.S.Code Cong. & Admin.News 1973, p. 2702 (1973).

The senate report also indicates that the price control provisions were included in order to effectuate the allocation authority contained in the Act: "In the absence of such regulations, the allocation program could be wholly frustrated by sellers who demanded prohibitively or exorbitantly high prices for supplies subject to allocation  .  .  .  ." (S.Rep.No.93–159, 93d Cong., 1st Sess. 26–27 (1973).

The House Report on the Allocation Act states:

> [T]he bill would require that the mandatory allocation program determine the prices of products or the methods for determining equitable prices of those products. This has been included on the premises that it does no good to require the allocation of products if sellers are then permitted to demand unfair and discriminatory prices.

H.R.Rep.No.93–531, 93d Cong., 1st Sess. 12, U.S.Code Cong. & Admin.News 1973, p. 2589 (1973).

■ The FEA's position is that the rents charged to service station operators are so inextricably interwoven with the prices which they pay for gasoline from Shell that the regulation of prices would be frustrated unless the FEA has also the authority to control the rents charged. The only factual basis for the argument is that some of the rents are expressed as a flat rate in cents per gallon and are therefore a combined charge to the retailer by the supplier for the purchasing and retailing of gasoline. It is, however, common in many businesses to express rent on a basis which is related to sales, and Shell's service station rentals and its gasoline sales are contracted for under separate agreements. All gasoline is not sold through lessee dealers, and no lessee of Shell is required to sell Shell gasoline.

It is undisputed that rents and prices, during the time from July 1, 1968, to July 1, 1971, when prices and rents were not controlled have not responded in the

same way to market forces. The average prices charged dealers for gasoline increased 2 percent, but the rentals for Shell service stations increased by 44 percent, and Shell's real estate costs associated with service stations increased 41 percent.

The mere fact that many leases provide that rent is to be determined on the basis of cents per gallon does not make prices and rents inextricably woven together so that they become legally identical. Rents are not prices; Congress recognized the difference in the Stabilization Act by providing for both. In the Allocation Act, Congress included prices but excluded rents. The legislative history of the Allocation Act reveals that rentals were not contemplated in the act as controllable in the guise of prices.

The plain reading of the statute coupled with its legislative history demonstrate that the defendants do not have the authority to promulgate rent control regulations or to control the rent of Shell's service stations under the Allocation Act.

Accordingly, it is hereby ordered and adjudged that:

1. The Federal Energy Administration's decision and order of December 10, 1974, in case of FER–0005 is declared null and void as being beyond its authority under the Emergency Petroleum Allocation Act of 1973, as amended, insofar as it has purported to control the rents charged by Shell Oil Company under service station leases.

2. The Federal Energy Administration's aforementioned decision and order is declared null and void as being beyond its authority under the Emergency Petroleum Allocation Act of 1973, as amended, insofar as it has purported to control the rents charged by Shell Oil Company under service station leases after the expiration of the foregoing Act on August 31, 1975.

3. The Federal Energy Administration's aforementioned decision and order is declared null and void as being beyond its authority under the Emergency Petroleum Allocation Act of 1973, as amended, in that Shell Oil Company has not been permitted to pass through its increased costs incurred with respect to its leased service stations.

4. Sections 212.101–103 of the Federal Energy Administration's price regulations are adjudged null and void as being beyond its authority under the Emergency Petroleum Allocation Act of 1973, as amended.

5. Defendants and all persons acting under their direction and authority or in concert or participation with them are permanently enjoined from enforcing or attempting to enforce against Shell Oil Company the aforementioned decision and order and Sections 212.101–103 of the Federal Energy Administration's price regulations.

### FINAL JUDGMENT

In accordance with the court's memorandum opinion of this date, the motion for summary judgment of plaintiff Shell Oil Company is hereby granted. Motion for summary judgment of the defendants Federal Energy Administration and Frank G. Zarb is hereby denied.

Accordingly, the case is dismissed.