PHILLIPS PETROLEUM COMPANY, Plaintiff,

v.

FEDERAL ENERGY ADMINISTRATION, Defendant.

TENNECO OIL COMPANY, Plaintiff,

v.

FEDERAL ENERGY ADMINISTRATION et al., Defendants.

PENNZOIL COMPANY, Plaintiff,

v.

FEDERAL ENERGY ADMINISTRATION et al., Defendants.

COASTAL STATES GAS CORPORATION, Plaintiff,

v.

FEDERAL ENERGY ADMINISTRATION et al., Defendants.

CONTINENTAL OIL COMPANY, Plaintiff,

v.

FEDERAL ENERGY ADMINISTRATION et al., Defendants.

Civ. A. Nos. 77–90, 77–130, 77–131, 77–144 and 77–155.

United States District Court, D. Delaware.

Aug. 11, 1977.

---

S. Samuel Arsht and William O. LaMotte, III of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., for all plaintiffs.

Paul J. Mode, Jr., Michael S. Helfer, and Alan B. Sternstein of Wilmer, Cutler & Pickering, Washington, D. C., for Phillips Petroleum Company.

John P. Mathis of Baker & Botts, Washington, D. C., for Tenneco Oil Co., and Pennzoil Co.

David J. Beck, Laurance C. Mosher, Jr., and J. Todd Sheilds of Fulbright & Jaworski, Houston, Tex., for Coastal States Gas Corp.

Rush Moody, Jr., Michael J. Henke, and F. Shaun Burns of Vinson & Elkins, Washington, D. C., for Continental Oil Co.

James W. Garvin, Jr., U. S. Atty., and John H. McDonald, Asst. U. S. Atty., Wilmington, Del., Barbara Allen Babcock, Asst. Atty. Gen., Stanley D. Rose, C. Max Vassanelli, and Robert E. Richardson, Attys., Dept. of Justice, Washington, D. C., for defendants.

## OPINION

LATCHUM, Chief Judge.

Plaintiffs, five oil companies [1] seeking declaratory and injunctive relief, have each brought a suit challenging the defendant, Federal Energy Administration's ("FEA") [2] interpretation and contemplated application of a regulatory scheme governing the method by which the plaintiffs priced their petroleum products as a result of increased costs incurred during a thirteen-month period from January 1, 1975 to February 1, 1976.

The FEA, invoking the doctrines of ripeness, exhaustion of administrative remedies and primary jurisdiction, has moved to dismiss these actions or to stay them pending completion of administrative consideration. This is the Court's opinion on FEA's pending motions. [3]

### A. The Background of the Dispute.

In 1973, the FEA acting pursuant to the Emergency Petroleum Allocation Act ("EPAA"), 15 U.S.C. § 751 et seq. and prior legislation, adopted detailed regulations imposing profit margin limitations and direct ceilings on prices that plaintiffs and other refiners could charge for refined petroleum products. 10 C.F.R. Part 212, Subpart E. Under these regulations each refiner's price ceilings were based on prices it charged in May 1973. However, a refiner could raise the prices of its products to recover increases, on a dollar-for-dollar basis, in its "product costs" (principally the cost of crude oil) and its "non-product costs" (which encompass most operating expenses). These increased costs could be recovered either (1) by raising the refiners' selling prices in the month following the month during which the increased costs occurred or (2) by saving or "banking" the increased costs for use in justifying a later selling price increase in subsequent months.

On November 29, 1974, the FEA issued a new regulation that purported to prohibit the banking of unrecovered non-product costs increases, effective as to costs incurred on and after December 1, 1974.[4]  39 Fed.Reg. 42368, 42372 (Dec. 5, 1974). These regulations continued to permit the banking of unrecovered product cost increases. The result of prohibiting the banking of non-product cost increases meant that if such cost increases were not recovered through a higher selling price in the month following the month in which the non-product cost increases were incurred, they could never be recovered.

For those months in which a refiner failed to pass through all its available cost increases, the refiner was required to calculate the amount of non-product cost increases it did recover, and the amount of non-product cost increases it did not recover, and therefore lost. Various refiners, in making these calculations under these regulations, apparently used three different methods. One method, the non-product cost increase first method ("NPCI First") treated all non-product cost increases as having been recovered first, and the product cost increases as having been recovered last. A second method, the "NPCI Last" method, treated all product cost increases as having been recovered first, and non-product cost increases as having been recovered last. A third method, the "Proportion-

1. The five companies are: Phillips Petroleum Corporation, Tenneco Oil Company, Pennzoil Company, Coastal States Gas Corporation, and Continental Oil Company.

2. The Administrator of the FEA is also named as a defendant in all actions except that brought by Phillips Petroleum Corporation; reference throughout this opinion to the FEA includes the Administrator.

3. This Court has previously denied (435 F.Supp. 1234 (D.Del.1977)) FEA's motions to transfer these actions to the United States District Court for the Northern District of Ohio, where similar litigation brought by other oil companies is pending. In that Court, the FEA presented motions to dismiss which parallel its motions filed in these cases, and Judge Manos, although confronted by some arguments not presented here, reached the same result as does this Court by this opinion. Standard Oil Company v. FEA (N.D.Ohio 1977), slip opinion July 21, 1977.

4. Because of the one-month delay imposed by the cost pass-through provisions, these amended regulations governed refiners' prices beginning on January 1, 1975.

al Method", treated non-product cost increases and product cost increases as having been recovered pro rata. The method of calculations used by a refiner determined the amount of non-product cost increases the refiner was permanently precluded from recovering.[5]

During the period that the regulations here at issue affected prices—between January 1, 1975 and February 1, 1976—FEA officials, through public pronouncements, private statements to refiners, instruction manuals, directives, forms and worksheets, indicated that the agency construed its regulations to permit or require the use of the Proportional Method.[6] (Docket Item 1, par. 11 in C.A. 77–90); 41 Fed.Reg. 33283 (Aug. 9, 1976); 41 Fed.Reg. 43953 (Oct. 5, 1976).

Effective February 1, 1976, the FEA issued a new set of refiner pricing regulations, one of which explicitly thereafter required the use of the NPCI Last Method. However, in the course of its announcement of these new regulations, the FEA, for the first time, took the position that the NPCI Last Method had also been required under the regulations affecting pricing during the period between January 1, 1975 and February 1, 1976. 41 Fed.Reg. 5111, 5113 (Feb. 4, 1976). This action provoked immediate and widespread criticism from the refiners. Within a few weeks, the FEA announced a rulemaking directed to the immediate repeal of these new amendments. 41 Fed. Reg. 9199, 9200 (Mar. 3, 1976).

Following public hearings in which the plaintiffs and other refiners participated, the FEA retroactively revoked to February 1, 1976 both the new regulation requiring the use of NPCI Last Method and the pre-existing regulation prohibiting the banking of unrecovered non-product cost increases. 41 Fed.Reg. 15330 (April 12, 1976). The FEA found that these two regulations, if in effect at the same time, would spur inflation, cause widely fluctuating prices for petroleum products, discourage refiners from building product inventories, reduce refinery production, and diminish capital investments. *Id.* at 15331. Based on these findings, the FEA adopted new regulations which permitted the banking of non-product cost increases on essentially the same basis of product cost increases and made these new regulations retroactive to February 1, 1976.

Despite these findings, the FEA with respect to the period between January 1, 1975 and February 1, 1976, has on numerous occasions, since February 4, 1976, officially expressed in public records the view that the regulations then in effect required the use of the NPCI Last Method and prohibited the banking of unrecovered non-product cost increases. *See* 41 Fed.Reg. 5111, 5113 (Feb. 4, 1976); 41 Fed.Reg. 9199 (Mar. 3, 1976); 41 Fed.Reg. 15330 (April 12, 1976); 41 Fed.Reg. 33282 (Aug. 9, 1976); 41 Fed. Reg. 40559 (Sept. 20, 1976); Public Letter of Sept. 23, 1976, from FEA Administrator, 122 Cong.Rec. E 5298, E 5299 (daily ed., Sept. 27, 1976); 41 Fed.Reg. 43953 (Oct. 5, 1976); *Apco Oil Corp.,* 5 FEA ¶ 83,100, FEE–3399 (Mar. 23, 1977); 42 Fed.Reg. 21315 (April 26, 1977); Gov. Main Brief, p. 2 (Docket 21 in C.A. 77–90).

Recognizing that "refiners might have concluded in good faith that recoupment on a proportional basis was permitted as a result of possibly ambiguous language [in

---

5. For example, assume that in a given month a refiner had incurred increased product costs of $70 and increased non-product costs of $30, a total of $100. Assume, however, that the refiner actually recovered during the following month only $90 (that is, 90 percent) of its increased costs. (This could happen, for example, because the refiner misestimated its sales when setting prices or because the market precluded charging the maximum allowable sales price.) Under the NPCI First Method, the refiner would be deemed to have recovered $30 in non-product costs and $60 in product costs; it could bank the remaining $10 of product costs for recovery in later months. Under the

NPCI Last Method, the refiner would be deemed to have recovered $70 in product costs and $20 in non-product costs; it would lose forever the remaining $10 of non-product costs. Under the Proportional Method, the refiner would be deemed to have recovered $63 in product costs ($70 times 90 percent) and $27 ($30 times 90 percent) in non-product costs; it could bank $7 of product costs for recovery in later months and would forever lose the remaining $3 of non-product costs.

6. According to the FEA, at least 29 refiners used the Proportional Method. 41 Fed.Reg. 40559, 40560.

the regulations] and certain information disseminated by FEA", the FEA, on August 3, 1976, issued a Notice of Proposed Class Exception and Public Hearing in which it proposed to provide refiners a "class exception" validating the use of the Proportional Method during the period in issue.[7] 41 Fed. Reg. 33282, 33283 (Aug. 9, 1976).

However, before the FEA could act, the Honorable John D. Dingle, Chairman of House Subcommittees on Energy and Power of the House Committee on Interstate and Foreign Commerce, strongly criticized the FEA's proposed class exception at a hearing before the Subcommittee on September 20, 1976 (Transcript of Hearing, Attachment B, Docket Item 21 in C.A. 77–90) and again in a statement released on September 23, 1976. See 112 Cong.Rec. E 5298 (daily ed., Sept. 27, 1976). In a September 23, 1976 letter from FEA's Administrator to Mr. Dingle, the FEA reiterated its intention "to enforce [the NPCI Last Method] interpretation of the regulation in all instance [sic] other than those in which a firm has applied for and been granted relief by FEA's Office of Exceptions and Appeals" and also made plain that FEA would not grant exceptions on the ground of "good faith reliance on erroneous guidance from FEA personnel." 112 Cong.Rec. E 5298, 5299 (daily ed., Sept. 27, 1976). On October 5, 1976, the FEA announced that it would not grant the proposed class exceptions but would require each refiner to "establish on an individual basis that it is subject to a serious hardship or gross inequity as a result of the FEA regulatory requirements" and in addition called upon all applicants to participate in "a consolidated exceptions proceeding" even though "there may not be any common class which is similarly affected by FEA's regulations." 41 Fed.Reg. 43953, 43954 (Oct. 5, 1976).

Thereafter, despite the imprecise nature of the exception proceedings, various refiners began filing applications for exception relief in late 1976 and early 1977. In February, the FEA sought applications from "consumer representatives" to intervene in the proceedings, 42 Fed.Reg. 10891 (Feb. 23, 1977), and it granted such an application by Consumers Union on March 17, 1977. *Consumers Union of the United States, Inc.*, 5 FEA ¶ 87014 (Mar. 17, 1977).

On March 23, 1977 the FEA announced it would evaluate three of the exception applications before it (one of which was filed by Continental Oil Company, a plaintiff herein) as "representative" of the applications which had been filed or could be expected, that it would "conduct separate proceedings in order to elicit the necessary findings with respect to the three applications", "that the findings may be consolidated for purposes of general arguments" and "that the findings and conclusions developed in the initial group of three cases will be most helpful . . . to the FEA . . . in resolving the remaining exception applications." *Apco Oil Corp.*, 5 FEA ¶ 83109 (Mar. 23, 1977).

During the course of three hearings on March 28, 1977, April 7, 1977 and April 15, 1977, efforts were made to determine the issues which would be addressed and the procedures to be followed in the exception proceedings. The net result of these hearings at least determined (1) that the correctness of FEA's interpretation and the lawfulness of the regulations as construed would not be reviewed in the exception proceedings (Docket Item 10A, Att. G, p. 59 in C.A. 77–90), and (2) no rules were proposed or adopted governing pre-hearing proceedings, motions, hearing of the representative cases, or evidence, but it was stated there was a "possibility" that proceedings would include discovery. (Id. p. 3–7); (Docket Item 10A, Att. M, p. 36–40 in C.A. 77–90).

Faced with the limited nature of the exception proceedings, the lack of definitive rules of procedure and other imponderables as to the way the proceedings would be handled, the three representative parties selected by the FEA then withdrew their exception applications and the five plaintiff

---

7. The FEA published a notice on September 20, 1976 stating that 29 of 104 refiners surveyed had used the proportional method for recouping increased non-product costs and that 46 others had used a method which had recovered non-product costs first. 41 Fed.Reg. 40559, 40560 (Sept. 20, 1976).

refiners in these cases immediately commenced these actions in this Court.

### B. *This Litigation.*

The complaints in these five cases were filed between March 11 and April 22, 1977 and they raise three major issues: (1) What is the meaning of the regulations in effect during the relevant period, *e. g.* did they permit or require the use of the Proportional Method to recover increased costs? (2) If the regulations were in effect as now interpreted by the FEA, are such regulations invalid because they (a) exceeded FEA's statutory authority, (b) were issued without notice and applied retroactively in violation of the Administrative Procedure Act, 5 U.S.C. § 553, (c) were issued without first obtaining an inflationary impact statement in violation of Executive Order No. 11821, 39 Fed.Reg. 41501 (Nov. 29, 1974), (d) had the effect of depriving plaintiffs of property without due process of law or just compensation in violation of the Fifth Amendment or (e) were not supported by a rational basis? (3) Is the FEA estopped from enforcing its interpretation of the regulations so as to prohibit the use of the Proportional Method because of plaintiffs' good-faith reliance on the conduct, statements and directives of the FEA?

As previously mentioned the FEA, relying upon the doctrines of ripeness, exhaustion of administrative remedies, and primary jurisdiction, has moved to dismiss these actions or to stay them pending the completion of the contemplated exception proceedings before the FEA.

### C. *Ripeness.*

First, the FEA argues that no case or controversy exists between the parties on the issues tendered by this litigation, a prerequisite to this Court's jurisdiction, and thus that these cases will not be ripe for judicial consideration until completion of the FEA exception process and perhaps administrative enforcement proceedings.

■ The factors to be considered in determining whether issues are ripe for judicial pre-enforcement relief, as it applies to administrative action, are found in *Abbott*

*Laboratories v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); *Toilet Goods Ass'n v. Gardner*, 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967); and *Gardner v. Toilet Goods Ass'n.*, 387 U.S. 167, 87 S.Ct. 1526, 18 L.Ed.2d 704 (1967). These cases hold that a controversy is ripe for pre-enforcement judicial relief if an affirmative answer can be given to the following four questions: (1) are the issues presented purely legal, (2) are the issues based on final agency action, (3) does the controversy have a direct and immediate impact on the plaintiffs' businesses, and (4) is the litigation calculated to expedite final resolution rather than delay or impede effective agency enforcement?

■ The Court is convinced that the issues raised by the complaints and synthesized above as issues (1), 2(a), 2(b), and 2(c), questioning the meaning of the FEA regulations and the validity of those regulations on three different grounds, if construed as FEA now says they should be, are ripe for judicial determination. This is so, first, because these issues are purely legal, requiring no factual determination. As stated in *Abbott Laboratories*, issue (1) raises the simple question "whether the statute was properly construed by the Commissioner . . . .", 387 U.S. at 149, 87 S.Ct. at 1515, and the Court need only to examine the language of the regulations, in the context of the congressional intent behind the applicable statutes, and the relevant regulatory decisions made during the period January 1, 1975 to February 1, 1976 in order to decide whether the agency's present construction comports with those documents, conduct and decisions. A similar interpretative question is raised by issues 2(a), (b) and (c), viz., if the regulations are construed in the manner now advanced by the FEA, were they beyond FEA's statutory authority, were they issued without notice and applied retroactively in violation of the Administrative Procedure Act or were they issued without obtaining an inflationary impact statement in violation of Executive Order No. 11821? None of these issues necessitates a judicial factual inquiry and they are purely legal questions under controlling

law.[8] See: *Abbott Laboratories, supra,* at 139, 149, 87 S.Ct. 1507; *Toilet Goods Ass'n. v. Gardner,* 387 U.S. at 161–162, 87 S.Ct. 1520; *Gardner v. Toilet Goods Ass'n.,* 387 U.S. at 169–170, 87 S.Ct. 1526; *National Automatic Laundry and Cleaning Council v. Shultz,* 143 U.S.App.D.C. 274, 443 F.2d 689, 695–696 (1971).

Second, the controversy relating to issues (1), 2(a), (b), and (c) (hereinafter "issues for determination") arises from final agency action. From the facts recited above, there is no doubt that the FEA between February 4, 1976 to date has officially expressed in numerous public statements and records that it is FEA's final interpretative decision that the regulations in question required the application of the NPCI Last Method during the relevant period. Indeed, defendant's memorandum filed with the Court in this case concedes that "the FEA regulations here in issue are final regulations and the FEA's published interpretation of these regulations may not be likely to be [sic] overturned by the agency during the course of any administrative hearing." (Docket Item 10, p. 28 in C.A. 77–90). The mere possibility that FEA could decide, in the exception proceedings, on the basis of "gross inequity" or "serious hardship", to relieve one or more of the companies of the regulatory requirement which the FEA has determined to be final, binding and enforceable, does not deprive this Court of the authority to review the agency's unequivocal interpretation of the applicable regulations. The FEA on the "issues for determination" has made a final interpretative decision. *Cf. Frozen Food Express v. United States,* 351 U.S. 40, 76 S.Ct. 569, 100 L.Ed. 910 (1956) (order having effect of notice of ICC interpretation); *Columbia Broadcast-*

*ing System v. United States,* 316 U.S. 407, 419, 62 S.Ct. 1194, 86 L.Ed. 1563 (1942) (FCC regulations representing only statement of intention); *National Automatic Laundry and Cleaning Council v. Shultz,* 143 U.S.App.D.C. 274, 443 F.2d 689, 698 (1971) (letter interpretation by Agency Administrator); *Air Line Pilots Ass'n v. DOT,* 446 F.2d 236 (C.A. 5, 1971) (FAA finding that proposed buildings would not be an air hazard if constructed).

Third, the Court finds that the present controversy has a direct, continuing and immediate impact upon plaintiffs' businesses particularly the pricing of their petroleum products on a current basis. As heretofore explained plaintiffs and other refiners are subject to the FEA's Mandatory Petroleum Pricing Regulations in the sale of about half of all refined petroleum products, most notably motor gasoline and aviation jet fuel. These regulations prohibit each refiner from charging more than a "maximum allowable price" for each covered product in each month. 10 C.F.R. §§ 212.82, 212.83. In computing each month's maximum allowable prices, refiners include certain previously unrecovered, banked cost increases—including the amount of unrecovered, banked costs which each refiner had on January 31, 1976, the last day the regulations here in issue were in effect. *Id.* § 212.83(e)(1). The amount of those January 31, 1976 banks was determined in part by each refiner's interpretation of the regulations in issue here, and thus each refiner's interpretation of these regulations directly affects its current pricing decisions.[9]

Each month that passes without resolution of the present controversy threatens plaintiffs with a dilemma. If they actually

8. The Court concludes that issue 2(e), that the regulations are invalid because they lack a rational basis, and issue (3), raising the defense of estoppel, are questions which require factual determinations which should first be made by the administrative agency. Not being purely legal questions, these two issues are not ripe for judicial consideration.

Furthermore, the Court will defer consideration of whether the constitutional claims asserted as issue 2(d) are substantial and should be certified to the Temporary Emergency Court

of Appeals pursuant to 15 U.S.C. § 754(a) and 12 U.S.C. § 1904 note § 211(c) until after the Court has ruled on those issues found to be ripe for judicial consideration.

9. Up to 10 percent of the January 31, 1976 bank may be recovered in any one month. 10 C.F.R. § 212.83(e)(5). Total banks of motor gasoline and aviation jet fuel for the 30 largest refiners were $373 million in January 1976. FEA, Monthly Energy Review, April 1977, at p. 75. Each of the present plaintiffs had as of January 31, 1976 banks of unrecovered costs.

charge the prices that they believe they are lawfully entitled to charge, they risk FEA action requiring price roll-backs, cash refunds, and substantial civil and criminal penalties, as well as private treble-damage actions.[10] On the other hand, if plaintiffs forebear from such pricing, they may be forced unnecessarily to delay further in recovering costs they have actually incurred, and they may be permanently barred from recovery by missing market opportunities that will never be repeated. It is simply unrealistic for the defendants to assert that "[p]laintiffs have already chosen their course of conduct" and that "the only remaining burden is that they must participate in the administrative review process." (Docket Item 10, p. 29 in C.A. 77–90).

Actually the "hardship" or burden on plaintiffs here is indistinguishable from the "direct effect on the day-to-day business" of the prescription drug companies whose claims were held ripe for adjudication in *Abbott Laboratories*, 387 U.S. at 152, 87 S.Ct. 1507. In that case, the companies were faced with a choice of risking "serious criminal and civil penalties" for noncompliance by the "continued use of [labels and advertising] material which they believe in good faith meets" the legal requirements, *id.* at 152–53, 87 S.Ct. at 1517, or complying by destroying existing materials and investing in entirely new supplies and printing equipment. This "immediate and significant change in the plaintiffs' conduct of their affairs with serious penalties attached to noncompliance," *id.* at 153, 87 S.Ct. at 1518, required judicial review without further delay. The regulations at issue there were, as they are here, "self-executing, and have an immediate and substantial impact." 387 U.S. at 171, 87 S.Ct. at 1528–29; *A. O. Smith v. FTC*, 530 F.2d 515, 524 (C.A. 3, 1976).

In fact, the FEA itself has recognized the immediacy of this problem. On July 27, 1976, the agency represented to the Comptroller General of the United States that it was "imperative that FEA be granted emergency clearances" for a new form to collect data related to the class exception, since "apparent serious adverse effects on the refinery and inventory levels of petroleum products" had led to the "urgent need" for such relief. *See* Docket Item 10, Attachment C in C.A. 77–90.

When GAO raised a question regarding the nature of the emergency, the FEA submitted the following written response:

> "If refiners must continue to wonder if reductions in 'banked costs' (or price rollbacks) will occur, they will be assuming a tremendous risk if they now set prices based on those 'banked costs.' This is the manner in which gasoline pricing has historically been working during the summer season—i. e., refiners use and have used 'banked costs.'" (Docket Item 10, Attachment C, p. 4 in C.A. 77–90).

Although FEA's response was made in July 1976, the "wonder" and "tremendous risk" continues unabated to the present time.

Finally, it is clear that the litigation of the issues for determination in this Court will not impede or delay effective agency enforcement but will expedite their final resolution. If plaintiffs prevail on the legal issues ready for judicial determination, the FEA exception proceeding and the development of many extensive, individual factual records will become unnecessary. The defendants claim that this litigation is "aimed in large part at avoiding and frustrating the FEA's enforcement and exceptions proceedings." Docket Item 10, p. 26, n. 15 in C.A. 77–90. To the contrary, these actions simply seek to secure prompt judicial resolution of narrowly defined legal issues

---

**10.** The civil penalties could amount to "$20,000 for each violation," 10 C.F.R. § 205.203(b)(1)(i), and the FEA takes the position that "[e]ach day that a violation . . . continues shall be deemed to constitute a separate violation. . . ." *Id.* § 205.203(a)(2); S.Conf.Rep.No. 94–516, 94th Cong., 1st Sess. 200–01 (1975). The FEA could also take the position that the failure to reflect its new-found interpretation in current or revised forms submitted to the agency is itself a violation of the reporting requirements. 15 U.S.C. § 772(b); 10 C.F.R. § 212.-126(b). There is now a treble-damage action pending between two petroleum companies in the Eastern District of Missouri questioning the legality of the challenged regulations. *Marine Petroleum Co. v. Champlain Petroleum Corp.*, C.A. No. 75–974c.

which may prove dispositive of the entire controversy, and to preclude the need for "later piecemeal resolution of the controversy in the context of individual enforcement proceedings." *Gardner v. Toilet Goods Ass'n, supra,* 387 U.S. at 173, 87 S.Ct. at 1530. Indeed, except for vague and unfounded fears about the FEA's "stature", Docket Item 10, p. 24, 31 & 39 in C.A. 77–90, the defendants have not sufficiently particularized why the denial of their motion to dismiss or stay would delay or impede the proposed exception proceedings.

### D. *Exhaustion of Administrative Remedies.*

■ The Court also concludes that defendants' contention, that until the exception proceedings are concluded that plaintiffs have failed to exhaust their administrative remedies, is without merit. In the first place, the FEA has taken a final and consistent position since February 4, 1976 that the regulations validly require use of the NPCI Last Method. The policies underlying the exhaustion doctrine are similar to those supporting the ripeness doctrine. One thing the exhaustion doctrine makes clear is that it is not intended to require endless pursuit of agency procedures with respect to issues on which the agency has taken a final position.

■ Relegating plaintiffs to exception proceedings in the hope that if the FEA is made aware of the faults of its policies, it may change them on its own volition, would be a futile endeavor under the circumstances of these cases. The FEA has already had numerous opportunities to correct the alleged error of its ways on these issues and no more is required under the exhaustion doctrine. *See Parisi v. Davidson,* 405 U.S. 34, 37, 92 S.Ct. 815, 31 L.Ed.2d 17 (1972); *Shell Oil Co. v. FEA,* 400 F.Supp. 964, 968 (S.D.Tex.1975), *aff'd,* 527 F.2d 1243 (Em. App.1975).

■ However, the important fact is that the exception proceedings will not address the legal issues which are ripe for determination before this Court. Where the legal issues of a controversy will not be considered in exception proceedings, exhaus-

tion of those proceedings is not required. *Kaiser Alum. & Chem. Corp. v. Consumer Product Safety Commission,* 414 F.Supp. 1047, 1055 (D.Del.1976); *Shell Oil Co. v. FEA, supra.* A court should not stand aside just because there is available to the plaintiffs some collateral agency proceedings that hold out the *possibility* of some kind of relief. *Greene v. United States,* 376 U.S. 149, 84 S.Ct. 615, 11 L.Ed.2d 576 (1964); *R. A. Holman & Co. v. SEC,* 112 U.S.App.D.C. 43, 299 F.2d 127 (1962), *cert. den.,* 370 U.S. 911, 82 S.Ct. 1257, 8 L.Ed.2d 404 (1962).

■ Finally the three principal purposes designed to be served by the exhaustion doctrine, viz., (1) to permit the administrative agency to bring its expertise to bear when technical considerations are involved in the resolution of issues, (2) to permit the agency to develop a full factual record where such facts would be useful to the Court in resolving the issues, and (3) to assure that governmental resources are used efficiently, are not present here.

As already pointed out in discussing ripeness, the issues for determination here are purely legal and do not turn on a large number of facts. Moreover, the kinds of facts that will underlie the legal issues for judicial determination do not require agency expertise to ascertain and will not be resolved in the context of an exception proceeding by the FEA into whether each refiner would suffer "gross inequity" or "severe hardship" from the application of the regulations to it.

The goal of efficiency is best served by a prompt resolution of the legal issues before the Court. A ruling on these issues will either lay the foundation for the exception proceedings by judging the FEA right, or will obviate the need for the plaintiffs and other proportional companies to participate in the exception proceedings by judging the FEA wrong.

### F. *Primary Jurisdiction.*

■ Defendants contend that the doctrine of primary jurisdiction compels this Court to defer to FEA's exception proceedings. The short answer to this contention is

that the doctrine of primary jurisdiction "is not a doctrine that governs review of administrative action" but is one that "determines whether the Court or the agency should make the initial decision." 3 K. Davis, Administrative Law Treatise § 19.01 at 1–2 (1958). As previously noted, the FEA has already had the first word and made the final decision on the legal issues for determination before this Court. Plaintiffs here simply seek review of the final agency decision, calling into question the meaning and validity of the relevant regulations. Thus the doctrine of primary jurisdiction is inapplicable to this litigation with respect to the issues finally determined by the FEA. *Mississippi Power & Light Co. v. United Gas Pipe Line*, 532 F.2d 412, 417–19 (C.A. 5, 1976); *Descomp, Inc. v. Sampson*, 377 F.Supp. 254, 259 (D.Del.1974).

An Order will be entered in accordance with this Opinion.

### ORDER

For the reasons stated in the Court's Opinion entered in these cases on this date, it is

### ORDERED

1. The defendants' motions to dismiss these actions or to stay them pending completion of administrative consideration are denied with respect to the following legal issues: (1) What is the meaning of the applicable regulations in effect during the relevant period, *e. g.,* did they permit or require the use of the Proportional Method to recover increased costs, (2) If the regulations were in effect as now interpreted by the FEA, are such regulations invalid because they (a) exceeded FEA's statutory authority, (b) were issued without notice and applied retroactively in violation of the Administrative Procedure Act, 5 U.S.C. § 553, or (c) were they issued without first obtaining an inflationary impact statement in violation of Executive Order No. 11821, 39 Fed.Reg. 41501 (Nov. 29, 1974).

2. The defendants' motions to dismiss these actions are granted with respect to the issues (d) whether the regulations were not supported by a rational basis and (e) whether the FEA is estopped from enforcing its interpretation of the regulations so as to prohibit the use of the Proportional Method because of plaintiffs' good-faith reliance on the conduct, statements and directiveness of the FEA.[1]

3. The Court defers consideration, whether the constitutional claims asserted by plaintiffs are substantial and should be certified to the Temporary Emergency Court of Appeals, until after the Court rules on the issues mentioned in Paragraph 1 above.

---

1. This provision will not bar the admission into evidence of the contemporaneous construction given to the statutes and regulations in question as exemplified by FEA's conduct, statements, directives, etc., during the relevant period.